[No. A021842. Sixth Dist. Nov. 21, 1985.]

LYNETTE WEST, Plaintiff and Appellant, v.
JOHNSON & JOHNSON PRODUCTS, INC., Defendant and Appellant.

832

838

**COUNSEL**

John W. Elliott, Robert P. Fisher, Glaspy, Elliott, Creech, McMahan, Roth & Reed and Glaspy & Glaspy for Plaintiff and Appellant.

George S. Frazza, Roger S. Fine, Robert E. Christiansen, Charles F. Preuss, Elliot L. Bien, Bronson, Bronson & McKinnon, Shirley M. Hufstedler, Hufstedler, Miller, Carlson & Beardsley, David F. Dobbins, Theodore B. Van Itallie, Jr., Shari Loe, Patterson, Belknap, Webb & Tyler, George Gore and Arter & Hadden for Defendant and Appellant.

## Opinion

**BRAUER, J.**—Plaintiff Lynette West (hereinafter West) contracted toxic shock syndrome while using a vaginal tampon manufactured by defendant Johnson & Johnson Products, Inc. (hereinafter JJP).[1] In a subsequent action based upon strict product liability, a jury awarded West $500,000 in compensatory damages and $10 million in punitive damages against JJP. A judgment was entered accordingly. Thereafter JJP moved for a new trial and for judgment notwithstanding the verdict. The trial court denied the latter motion, but conditionally granted the motion for new trial on the ground of excessive damages; a new trial was ordered unless West agreed to accept a reduction in compensatory damages to $100,000 and a reduction in punitive damages to $1 million. (Code Civ. Proc., § 662.5, subd. (b).) West filed a written acceptance of the reductions.

JJP appeals from the judgment and from the order denying its motion for judgment notwithstanding the verdict. (Code Civ. Proc., § 904.1, subds. (a) and (d).) West cross-appeals from the order modifying the judgment.[2] (Code Civ. Proc., § 904.1, subd. (b).)

On appeal JJP contends:

1. That West's counsel, by means of a "semantic ploy," mischaracterized the action as a "design defect" case rather than a "failure to warn" case; and this "semantic ploy" led to the rejection of JJP's proffered instructions on "failure to warn";

2. That no substantial evidence was presented to show that a lack of adequate instructions or of a warning proximately caused West's injury;

3. That the trial court committed prejudicial error by receiving in evidence, over objection, testimony concerning consumer complaints about JJP's tampon;

4. That West's counsel engaged in prejudicial misconduct in opening statement, in examining witnesses, and in argument; and

5. That the trial court committed prejudicial error in instructing the jury (a) on the "consumer expectation" test, rather than the "risk-benefit" test,

---

[1] Since both parties are appellants, we have designated them respectively as plaintiff and defendant.

[2] The cross-appeal is proper. (*Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 343-45 [126 Cal.Rptr. 731]; accord, *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 918 fn. 1 [148 Cal.Rptr. 389, 582 P.2d 980].)

set forth in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 435 [143 Cal.Rptr. 225, 573 P.2d 443]; (b) on the issue of punitive damages; and (c) on the issue of willful suppression of evidence.

On cross-appeal West contends, in essence, that the trial court abused its discretion in ordering that her remittitur be a condition precedent to a denial of JJP's motion for new trial.

For reasons hereinafter set forth, we find each of the foregoing contentions to be without merit, and we therefore affirm both the judgment and the order.

## I. THE INJURY

In February of 1980, West was a 20-year-old student living with her parents. During the weekend of February 23-24, her regular menstrual cycle began. As was her custom, she used o.b. tampons[3] manufactured by JJP. She had been using o.b. tampons for close to five years. She preferred o.b. tampons to other brands because (a) they were shorter in length, (b) their fibers were more tightly compacted, and (c) they required no applicator. Depending on the rate of her menstrual flow, she usually used either "regular" or "super" o.b. tampons.[4] On the evening of February 26, 1980 West had a date to attend a rock concert. In preparing for the date, she inserted a fresh o.b. tampon. She felt fine during dinner and during the first part of the concert. But during the latter part of the concert she became "very hot and very light headed, and just started feeling kind of faint—very drained." She walked around in the hall for awhile, got a drink of water, and returned to her seat. Then she again became "very faint, and very hot." She again left her seat, and lay down in a cement aisle in the auditorium, to "try and cool down." Her escort took her home. When she went to bed she was feeling "[r]eally tired, really drained, very hot."

The next day, February 27, she felt worse. She decided to stay home in bed. Throughout the day she felt "real hot," "really weak," and sometimes "really faint." She thought she had the flu. She was still using tampons; at trial she could not remember whether she changed tampons that day. In the evening she began vomiting, and lost control of her bowels.

---

[3]The label printed on a box of o.b. tampons admitted in evidence shows the product name in lower-case letters with periods, thus: "o.b." The record does not disclose what, if anything, "o.b." means.

[4]West testified that o.b. tampons were available in four different types: "There is minis, regular, supers, and super plus."

On the morning of February 28 she collapsed on the floor of the bathroom, and was unable to move. Her parents carried her out to their car, and then took her to a Kaiser Hospital emergency room.

Initial examination revealed that West had a wealth of symptoms, including the following: (1) abnormally low blood pressure, which was falling— West was "approaching shock"; (2) a fever with a temperature of 104.4 degrees, and chills; (3) vomiting; (4) pronounced reddening of the skin; (5) accelerated heartbeat; and (6) swollen tonsils with exudate. Laboratory tests disclosed abnormalities in the functions of West's liver and kidneys. West had a tampon in place; she was asked to remove it and did so.

Cultures were taken from West's vagina, rectum, and throat. The throat culture showed the presence of a bacterium known as beta-hymolytic streptococcus in West's throat. The vaginal and rectal cultures produced negative results.

Because of her falling blood pressure,[5] West was transferred to the hospital's intensive care unit. She was given intravenous fluids and antibiotics. One of the antibiotics was penicillin. Her blood pressure continued to fall, and she was in "very severe danger." She remained in severe shock for approximately 18 hours.

On the morning of February 29 West's blood pressure gradually began to rise. By evening it had risen to a level of 100 systolic. But her creatinine level continued to rise, indicating that her kidneys were not yet functioning properly. Over the next few days West's condition stabilized; she ceased vomiting, her fever disappeared, and her blood pressure returned to normal, along with her liver and kidney functions. She was discharged from the hospital on March 4, 1980. Shortly after she returned home, the skin of her palms and of the soles of her feet peeled off in large chunks. She stayed at home for about a week, and then resumed her classes. But her full strength and endurance "didn't come back until months later."

When the Kaiser physicians first examined West, they were puzzled by her malady. In the words of one physician: "When someone is that sick, you're very, very insecure, not knowing what you're treating. We really had no direction to go on. We thought it was an infection, because of her fever. But we didn't have any clues at all." West's discharge summary contained a primary diagnosis of "shock with oliguric renal failure, etiology unclear," and a secondary diagnosis of "streptococcal pharyngitis." But

---

[5] West's blood pressure gradually decreased from a systolic level of 100 to a systolic of 60-70 over a diastolic of 0. At that point West was in "severe shock."

because the case was puzzling, the physicians asked West to come in for followup visits. On March 27, West reported that she was feeling fine, and she appeared to be healthy. On June 30, she appeared to have no residual damage as the result of her illness.

Some months later, after reading reports published by the federal Center for Disease Control in Atlanta, Georgia, the Kaiser physicians reviewed West's medical records once again, and came to a unanimous conclusion that West had suffered from menstrually related toxic shock syndrome (hereinafter TSS). One of the physicians told West about the belated diagnosis. As we shall see in part IV of this opinion, *post,* the diagnosis was hotly disputed at trial.

## II. THE SYNDROME

TSS was first identified as such in 1978 by Dr. James K. Todd of the University of Colorado. Dr. Todd observed the syndrome only in children. Later retrospective studies showed that the syndrome affects adult men and women as well as children, and that the syndrome has been around for many years, although not necessarily recognized as such.

Early in 1980 the federal Center for Disease Control (hereinafter CDC) began receiving reports from physicians and from state health departments about a "new disease." Approximately 97 percent of the cases reported involved menstruating women. According to reports, the women had fevers, temperatures as high as 107 degrees, profound shock, extremely low blood pressure, skin rashes, and liver and kidney abnormalities. At that time, the origin of the "disease" was unknown. Because its prevalance appeared to be increasing, the CDC organized a task force to study the phenomenon. By May of 1980 approximately 55 cases of the new "disease" had been reported; according to one expert witness, "about ten percent of everybody who got the disease had died."

The CDC task force began by drafting a restrictive definition of the new "disease." Included in the profile were the following elements: (1) a temperature of at least 102 degrees; (2) a sunburn-like rash, usually all over the body; (3) desquamation, i.e., peeling of the skin 7-10 days after the malady subsided; (4) abnormally low blood pressure; (5) diarrhea and vomiting; (6) pain in the muscles; and (7) abnormalities in liver and kidney functions. On May 23, 1980, the CDC published a report which indicated a strong correlation between the new "disease" and menstruation. In a second bulletin published June 27, 1980, the CDC established a close association between incidents of TSS and tampon use.

Sometime in the middle of June, before its second bulletin on TSS was published, the CDC invited tampon manufacturers to Atlanta, Georgia, to learn of its findings. Since the CDC knew very little about tampons, it asked the manufacturers for information about how tampons were manufactured and marketed. It also asked the manufacturers for any data they had concerning vaginal physiology and microbiology. For the most part, the manufacturers (including JJP) had no information to offer.

The CDC then undertook its own microbiological studies. Within a period of three to four weeks, the CDC established that the symptoms of TSS are caused by a particular type of toxin (or poison) secreted by a particular strain of bacteria known as staphylococcus aureus. Staphylococcus aureus commonly occurs in the vaginas of a certain small percentage of women; and that fact has been known for at least 50 years.

In the summer of 1980 the CDC recommended that those women who wished to avoid the risk of menstrually associated TSS should stop using tampons. To those women who continued to use tampons, the CDC recommended that the tampons be used only part of the time. The CDC also recommended to the Food and Drug Administration that warnings concerning the hazards of menstrually related TSS be placed on the outside of tampon packages.

### III. The Defendant, the Product, Testing, and Complaints

#### A. *The Defendant*

JJP is a New Jersey corporation having its principal offices in New Brunswick. It is a wholly owned subsidiary of a parent corporation known as Johnson & Johnson, Inc. The parent is not a party to this action.

At the time of West's injury in 1980, JJP manufactured a wide range of products, including bandages and surgical dressings, toothbrushes and dental floss, various orthopedic devices, and the like. One of those products was the o.b. tampon.

#### B. *The Product*

The o.b. tampon originally was designed in Germany by a female gynecologist, Dr. Judith Esser. It has been marketed throughout Western Europe since the late 1940s by the Carl Hahn Company, a German firm. The Carl Hahn Company is a wholly owned subsidiary of JJP's parent corporation, Johnson & Johnson, Inc.

The product is composed of 70 percent rayon and 30 percent cotton. In the manufacturing process, a small amount of a surfactant known as Tween 20 is added to prevent the buildup of static electricity in the fibers. The tampon fibers themselves are intertwined, rolled, and compressed in such a way as to maximize their natural capillary capabilities; and as a result, the tampon is highly absorbent. As it begins to absorb menstrual fluid, the o.b. tampon expands radially and pushes against the user's vaginal walls.[6] Unlike other brands of tampons, the o.b. has no applicator or inserter; the user inserts it with her fingers alone.

In 1974 o.b. tampons were imported into the United States and test-marketed in various regions of the country.[7] In 1977 JJP began manufacturing o.b. tampons in the United States and distributing them throughout the nation.

## C. *Premarket Scientific Investigations and Testing*

In the years 1971-1973, before the o.b. tampon was imported into the United States, several studies were conducted in the microbiology department of Personal Products Company (hereinafter PPC), which is yet another wholly owned subsidiary in JJP's parent corporation, Johnson & Johnson, Inc. The studies were part of a research program initiated and supervised by the head of the department, Dr. Kenneth S. Kraskin.[8] The purpose of the studies was to explore and define the numbers and types of bacteria present in the vagina both before and during the menstrual period. Among other things, the studies disclosed the following:

Before a menstrual cycle begins, the interior of a normal healthy adult vagina is a slightly acidic environment, in which most pathogenic bacteria (i.e., bacteria capable of producing disease) will not grow. With the onset of the menses, the interior of the vagina ceases to be acidic and becomes a neutral or even slightly alkaline environment. When that happens, various kinds of bacteria "invade" the vagina—including a type of bacterium known as staphylococcus. Some of the invading bacteria are pathogenic. The menstrual fluid provides a rich nutrient material for the invading microorganisms, and they multiply very rapidly. When the menstrual flow ceases, the

---

[6]Prior to trial in this action, its promoters claimed that the o.b. tampon afforded "gap-free protection" from leakage of menstrual fluid.

[7]Also in 1974 one of JJP's competitors, Procter & Gamble Manufacturing Company, began test-marketing its own brand of super-absorbent tampon known as the Rely tampon. (See *Kehm* v. *Procter & Gamble Mfg. Co.* (8th Cir. 1983) 724 F.2d 613, 616-617.)

[8]The "Dr." signifies a doctorate degree in microbiology. Dr. Kraskin is not a physician. By the time of trial he had been elevated to the position of director of applied research at PPC.

interior of the vagina once again becomes a slightly acidic environment, and the invading bacteria diminish.

The studies also revealed that about 6 percent of the women tested had in their vaginas a particular strain of staphylococcus known as staphylococcus aureus.

Data collected from the studies was written down in research notebooks kept in the PPC microbiology laboratories. However, Kraskin himself communicated a good deal of that information to a scientist at JJP.[9]

In the years 1975 and 1976, PPC conducted additional studies with experimental o.b. tampons supplied by the Carl Hahn Company. The experimental tampons had a small amount of "acidic residue" in them. The purpose of the studies was to discover whether the use of the experimental "acidic" tampon would maintain a more acidic balance in the vagina during menstruation, and thus reduce the multiplication of pathogenic microorganisms. The project ultimately was dropped, because preliminary studies indicated no significant difference in results when using the "acidic" o.b. tampon. But the studies did reveal two significant things. First, when an o.b. tampon (treated or untreated) is in place, the total bacterial count in the interior of the vagina drops markedly during the first days of menstruation—an indication that the tampon absorbs bacteria. Second, when an o.b. tampon is removed, in some cases small fibers are left behind in the vagina.[10] The results of the 1975-1976 studies were made known to personnel at JJP.

In preparing for the American manufacture of the o.b. tampon, JJP sought to duplicate the German product. JJP selected domestic cotton and rayon of the same grade as the German, and then tested the ingredients to determine whether they caused any unusual clinical effects. The exact nature of the tests is not clear from the record. One of West's experts, a microbiologist, referred to them as "patch tests," and described them as follows: "You put it on the skin, an allergist does this commonly, to see if there's any reaction.

---

[9]In direct examination, Kraskin was asked the following question: "Dr. Kraskin, in the mid '70s, when they were preparing to manufacture o.b. in the United States and sell it in the United States, did you consult with them about vaginal microflora and tampons manufacturing practices?" Kraskin replied: "Yeah. One of the scientists at Johnson & Johnson Products, who was given the mandate to bring the tampon into the United States, essentially, one doctor, Eric Flam, had called me, and we had several meetings in which he asked questions about the microbiol—all the microbiology that we had determined as far as the flora, the flora in the vagina during menstruation, before menstruation, microbiology of the fibers and the like, yeah."

[10]This phenomenon was called "sloughing" by several witnesses.

[¶] They chose twenty-five female panelists, and tested it for seventy-two hours and concluded there was no skin irritation.''

Up to the time of trial, JJP had conducted no studies to ascertain whether use of a tampon was in any way related to vaginal infection.

### D. *Consumer Complaints*

In 1975 JJP began receiving complaints about o.b. tampons from consumers and physicians.[11] Most of the complaints related to adverse reactions experienced in use of the product. According to one witness, consumers complained of (among other things) "irritation, infection, vaginitis, discharge, pain, burning, rash." Some women complained of "sloughing," i.e., the phenomenon of fibers remaining in the vagina when the tampon was removed. Others complained that the tampons were difficult to remove; in some cases, the tampons had to be removed surgically. A physician wrote that use of o.b. tampons had caused severe vaginitis in his daughter, and he asked JJP to examine its product to "shed some light on the problem." One woman complained that use of o.b. tampons had caused a bladder infection, and her report was confirmed by her gynecologist. Another woman complained that she suffered vaginal infections after two consecutive menstrual periods, the second infection more severe than the first. Yet another woman complained of repeated vaginal infections, requiring medical treatment, after each succeeding menstrual cycle. Still another woman complained that she suffered pelvic inflammatory disease; her report was confirmed by her physician. Another physician wrote that several of his patients had vaginal infections attributable to the use of o.b. tampons. Still another physician complained that o.b. tampons swelled too much in the vaginas of very young girls with intact hymens.

In one instance, a woman suffered from upper abdominal pain, nausea, hot and cold flashes, diarrhea, fever, and dizziness over a period of two days. On her way to work, she fainted on the subway. Her physician discovered an old o.b. tampon in the woman's vagina; apparently she had forgotten it.[12]

The record does not reveal the total number of consumer complaints registered. But between 1975 and February of 1980 (the month of West's illness), JJP received approximately 150 complaints of a "more serious" nature.

---

[11]The consumer complaints discussed here continued from 1975 to the end of 1979.

[12]Our list of examples of consumer complaints is illustrative rather than exhaustive.

JJP's efforts to respond to the complaints varied with the circumstances. Some consumers refused to respond to JJP's letters. Others refused to allow their physicians to communicate with representatives of JJP. On occasion the physician himself refused to respond to inquiries from JJP. In a few instances the physician responded that he had never treated the consumer in question.

When cooperation and communication were established, JJP usually would ask the consumer to return the unused portion of her box of o.b. tampons. JJP then tested the unused tampons to see if they met manufacturing specifications for size, shape, and durability. Then, depending on the consumer's wishes, JJP would send her either a refund, a coupon with which to purchase more o.b. tampons, or other products such as shampoo or baby powder.

In the face of the consumer complaints JJP did no additional testing of o.b. tampons. In the words of JJP's research director: "We did not see enough of those letters to indicate to us that there was anything other than a chance, you know, women with vaginitis, and the use of the tampon, that would indicate to us that we needed to do additional studies, that there might be something unsafe about our tampons."

## IV. The Expert Testimony

Each side produced physicians and microbiologists as expert witnesses at trial. As might be expected, the opinions of the experts differed on a variety of topics. Without setting forth each expert's testimony in detail, we attempt here to summarize the opinions advanced.

### A. *On West's Illness*

The experts disagreed as to the diagnosis of West's illness. In a nutshell, West's experts testified that West had suffered from menstrually related TSS, whereas JJP's experts testified that she had contracted streptococcal scarlet fever.

According to West's experts, West had virtually all of the symptoms of TSS, including fever, abnormally low blood pressure, a sunburn-like rash, diarrhea and vomiting, pain in the muscles, abnormalities in her liver and kidney functions, and peeling of the skin after discharge from the hospital. The smooth rash, the diarrhea, and the liver and kidney abnormalities were symptoms inconsistent with those of streptococcal scarlet fever. The presence of streptococcus bacteria in West's throat was not inconsistent with a diagnosis of menstrually related TSS. The fact that no staphylococcus bac-

teria were found in the cultures taken from West was inconsequential, because the hospital laboratory was not instructed to look for staphylococcus.

According to JJP's experts, the presence of exudate on swollen tonsils (which West had) is extremely unusual in cases of TSS. The presence of streptococcus bacteria in West's throat, the exudate, and the absence of staphylococcus bacteria in any of her cultures, all indicated that she had streptococcal scarlet fever rather than TSS.[13] Furthermore, staphylococcus aureus—which excretes the toxin which produces TSS—is resistant to penicillin, whereas streptococcus is not. In the course of her hospital treatment West received rather large doses of penicillin. This was the basic reason for her recovery; the penicillin killed the streptococcus, whereas it would have been ineffective against staphylococcus. The other antibiotics given to West would also have been ineffective against staphylococcus. The smooth rash, vomiting, diarrhea, and liver and kidney abnormalities, all were consistent with a diagnosis of streptococcal scarlet fever.

B. *On Product Defects and Proximate Cause*

At the time of trial (Nov.—Dec. 1982), the exact molecular mechanism by which tampons contributed to menstrually related TSS had not been proven. Attempts were being made to duplicate the syndrome in laboratory animals. JJP's experts relied heavily on the fact that up to that time, no study had proved a cause-and-effect relationship between the use of tampons and the occurrence of TSS. They also maintained (a) that tampons by themselves did not cause TSS, and (b) that o.b. tampons were not defective in any way.

On the other hand, West's experts testified that o.b. tampons were defective in several particulars, and they expressed opinions as to how those defects contributed to the incidence of TSS. We summarize their views as follows:

1. A tampon—any tampon—is essentially a body which is foreign to the human vagina.[14] In the presence of a foreign body, the white blood cells which normally attack pathogenic bacteria do not function well. As a result, pathogenic bacteria tend to multiply and to secrete additional toxins.

2. The highly absorbent quality of an o.b. tampon is itself a defect. The addition of Tween 20 to the tampon actually increases its ability to absorb

---

[13]JJP's experts conceded, however, that apart from the throat culture showing the presence of streptococcus bacteria, West's symptoms were perfectly consistent with menstrually related TSS.

[14]One of JJP's experts conceded that a "tampon does something nature didn't intend."

fluid. Because of that quality an o.b. tampon is able to absorb more menstrual fluid, and therefore more of any pathogenic bacteria that may be present in the fluid. The fluid provides food for those bacteria, and so a fluid-filled tampon provides an ideal environment in which they can multiply.[15]

3. The radial expansion feature is also a defect. When an o.b. tampon expands in place, it occludes the vaginal canal and becomes a "plug" which is analogous to an abscess. The radial expansion feature also contributes to the "sloughing" of fibers when the tampon is removed. The fibers left behind in the vagina become breeding sites for pathogenic bacteria.[16]

4. The mesh-like network of fibers in an o.b. tampon is another defect. The network inhibits white blood cells from attacking pathogenic bacteria inside the tampons.

5. An o.b. tampon is potentially dangerous because a woman must insert it with her own fingers. If she has pathogenic bacteria on her hands, the insertion of an o.b. tampon can lead to the introduction of such bacteria into her vagina.

6. Another defect lay in the manufacturer's instructions, contained in an insert which came with every box of o.b. tampons. Those instructions told the user that "Changing tampons too frequently can be uncomfortable," and "Try not to change your tampon until it's nearly saturated." The instructions thus encouraged the user to leave an o.b. tampon in place longer than was healthy.

7. On the question of proximate cause, West's experts expressed themselves in varying ways. One said, "Tampons are a critical factor for the development of this infection in the vagina," and "All the studies that have been done have indicated that tampons are a critical risk factor in developing menstrually associated [TSS]." Another expert testified that the more a particular tampon blocks a vagina, the greater is the risk of contracting TSS. Yet another expert testified that in his opinion, "tampons are a cause of toxic shock syndrome, and I believe in this case that Miss West's disease was due to the presence of that tampon. If that tampon had not been present,

---

[15]Two of JJP's experts conceded that as a tampon absorbs menstrual fluid, it also absorbs any staphylococci in the fluid.

[16]One of JJP's experts grudgingly allowed that in retrospect, the concept of "gap free protection, where you get a snug, gap free fit," was perhaps not a very good idea.

all other things being equal, in my opinion she would not have come down with that disease."[17]

## C. *On Conscious Disregard for Public Safety*

The experts disagreed (a) as to whether menstrually related TSS could have been discovered prior to June of 1980, and (b) as to whether additional testing of o.b. tampons would have revealed an association between their use and the occurrence of TSS.

According to JJP's experts, menstrually related TSS is caused by a "newly emergent" strain of staphylococcus aureus, which appeared in the 1970s. The toxin produced by that strain was not isolated until the fall of 1980. Prior to February of 1980, there was "absolutely no way" that anyone could have predicted an association between tampon use and TSS, "unless he had a crystal ball." The o.b. tampon was thoroughly and adequately tested before being marketed in the United States. The consumer complaints did not indicate that any further testing of the o.b. tampon was required.

West's experts testified to the contrary. In their opinion:

1. The strain of staphylococcus aureus which produces menstrually related TSS, though rare, has been around for a long time. So has its toxin. Cases of menstrually related TSS occurred as far back as 1947. Had appropriate testing been done, TSS would have been recognized much earlier than 1980.[18]

2. West's experts were allowed to examine JJP files obtained through discovery. In examining those files, West's experts could find no evidence that JJP had ever done any significant preliminary studies of the basic microbiology of the human vagina.[19] According to one of West's microbiologist experts, "I would say that with the knowledge of these microorga-

---

[17]These opinions were reinforced to a slight extent by one of JJP's experts, who testified: "I think what everybody agrees is that something happens in the vagina, with the tampon, that makes an environment . . . or selects out or makes it a hospitable environment and allows the organism to grow."

[18]In the words of one microbiologist, "I don't know if we could have predicted toxic shock syndrome as we're seeing it today, but I think we would have had enough evidence at that point [i.e., in 1977 or 1978] to at least be cautious, and proceed prudently, slowly, cautiously. And let advances in technology be tempered with this caution, and not going faster and faster, making these tampons more super absorbent. At some point, if we watched this very closely, we certainly would have seen toxic shock much earlier than we saw it."

[19]Copies of the notes taken during the 1971-1973 studies in the PPC laboratories were not made available though discovery. We shall address this point further in part IX of this opinion, *post.*

nisms having existed in that particular body site, the human vagina, and knowing the numbers of organisms are of such a high quantity during non-menstrual times, whereas menstruation increases that concentration to ten to the eleventh to ten to the twelfth [power] cells per cc of fluid, anybody who would disregard this completely and perform experiments which didn't even take this into consideration, to my mind is an act of unbelievable irresponsibility . . . ." Furthermore, it appeared that JJP had performed no tests to determine whether digital insertion of o.b. tampons would result in pathogenic bacteria being inserted into the vagina. According to the same expert, "the manufacturer that did not do that is obviously in total disregard to the public safety and welfare in my opinion."

3. The same microbiologist testified that JJP's instructions to consumers of o.b. tampons were "an unbelievable thing . . . . What they are saying is, in other words, leave it in, let it grow, and it will reach a point where it will produce a problem in the body."

4. Faced with the consumer complaints, JJP should have initiated an "adequate appropriate testing program" to ascertain whether the use of o.b. tampons causes vaginal infections. Another of West's experts testified that JJP's failure to look at the possibility of infection as a result of tampon use "was conscious, and in my professional opinion as a microbiologist, this was disregarding a very serious problem." JJP had a scientific obligation to determine whether its tampons were causing infections, and it "completely ignored it."

5. The 1975-1976 studies done at PPC by Dr. Kraskin and others were inadequate to demonstrate the safety of o.b. tampons. Those studies made use of too few human subjects; no inquiry was made as to what would happen if an o.b. tampon were left in the vagina for varying lengths of time; women with histories of vaginitis were excluded from the studies; and no tests were performed to see whether o.b. tampons caused vaginal infections. In evaluating the tests actually done, an expert testified, "I think they have seriously flubbed. They missed major areas they should have addressed."

## V. The "Semantic Ploy"

West's first amended complaint contained four causes of action, viz.: (1) negligence; (2) breach of express warranty; (3) breach of implied warranty of fitness; and (4) strict product liability based on defects in design and manufacture. The fourth cause of action also included a paragraph relating to punitive damages, which were requested because JJP allegedly (a) knew that o.b. tampons were defective in design, and (b) nevertheless put the

products into the stream of commerce in conscious disregard of the safety of consumers and "without giving notice of the defect to the purchasers."

■ After West had rested her case, her counsel advised the court in chambers that West thereafter would proceed solely on the fourth cause of action, i.e., strict product liability based on defects in design. During a discussion about jury instructions, an argument developed as to whether this action should properly be classified as a "design defect" case or a "failure to warn" case. JJP's counsel took the position that "[p]laintiff has emphasized throughout the case that she does not approve of the instructions on the box or the package insert or that we should have tested it, and it is my opinion the case has always been a duty to warn or a duty to test." West's counsel maintained that "there is a design defect in the entire product," "including instructions for the woman to keep the tampon in place until saturated, which the testimony has shown is quite dangerous." He also said, "It's never been my position in this case that the defendant had a duty to warn [of] the potential of toxic shock syndrome . . . ." The trial court decided to give instructions to the jury pertaining to defect in design, and rejected JJP's proffered instructions on a manufacturer's duty to give adequate warning and to test its product.[20] Other instructions relating to theories of negligence and of breach of warranty were withdrawn.[21] West's counsel also withdrew an instruction he had prepared relating to a manufacturer's duty to warn.[22]

JJP now contends that West's counsel used a "semantic ploy" to transform what was clearly a "failure to warn" case into a "design defect"

---

[20]JJP's instruction F, rejected by the trial court, read as follows: "A manufacturer's duty to warn is commensurate with what it knew, or in the exercise of reasonable care should have known, of the risks involved in the use of its product as measured by available scientific and medical data. In determining whether the manufacturer gave adequate warning, you may consider only the state of medical and scientific knowledge available prior to and as of the time of plaintiff's illness. You may not consider on that issue scientific and medical data that became available only after that time."

JJP's instruction G, also refused by the trial court, read as follows: "A manufacturer has a duty to test adequately for known or foreseeable side effects which the manufacturer knows or has reason to know are inherent in the use of its product as measured by available scientific and medical data. In determining whether the manufacturer tested adequately, you may consider only the state of medical and scientific knowledge available prior to and as of the time of plaintiff's illness. You may not consider on that issue scientific and medical knowledge that became available only after that time."

[21]The instructions that actually were given to the jury are discussed in part IX· of this opinion, *post.*

[22]Plaintiff's instruction 23, withdrawn by West's counsel, read as follows: "A product is defective if the use of the product in a manner that is reasonably foreseeable by the defendant involves a substantial danger that would not be readily recognized by the ordinary user of the product and the manufacturer fails to give adequate warning of such danger."

case.[23] JJP argues that it had no duty to warn of unknown or unknowable dangers (citing *Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338, 343 [157 Cal.Rptr. 142], hg. den. Sept. 20, 1979), and that the rejection of its "failure to warn" instructions "stripped" JJP "of its entire defense."[24] In short, the argument boils down to this: Had West's counsel selected the "correct" theory of the case, West would have had no case.

We do not find this argument persuasive. First, we know of no reported decision, and none has been cited to us, which holds that a plaintiff in a product liability action must adhere to a theory of the case which inevitably will result in a nonsuit or in a defense verdict. Second, virtually an identical argument was made and rejected in *Brochu* v. *Ortho Pharmaceutical Corp.* (1st Cir. 1981) 642 F.2d 652, 655. In that case a wife suffered a cerebral thrombosis as a result of using an oral contraceptive manufactured by the defendant. In their action for damages, wife and husband proceeded on theories of fraudulent misrepresentation and strict product liability. Their theory of strict product liability was in turn bifurcated into claims of defective design and failure to warn of a concealed danger. A jury found for the plaintiffs. On appeal the defendant manufacturer contended, among other things, that the case had been tried on an erroneous theory of design defect, and that the plaintiffs' design defect argument was a "semantic ploy." The court of appeals said flatly, "We disagree," and went on to note that as to the claim of design defect, "there were evidentiary grounds to support a jury finding of liability on this claim." The judgment was affirmed. (*Id.,* at pp. 653-655, 664.)

In *Kehm* v. *Procter & Gamble Mfg. Co.* (8th Cir. 1983) 724 F.2d 613, a wife died from TSS contracted while using a vaginal tampon manufactured by the defendant. In a subsequent action for wrongful death, the husband

---

[23]The use of the phrase "semantic ploy" subliminally suggests that West's counsel somehow hoodwinked the trial judge into giving improper instructions. We find that notion to be unsupported.

[24]On appeal JJP contends that the "duty to test," covered in one of its rejected instructions (see fn. 20, *ante*), "is subsumed within the broader duty to warn, because a failure to test a medical product for unanticipated side effects is relevant only if the testing at issue would have put the manufacturer on notice of a risk to be warned or instructed about." As we note *post* in part IX B of this opinion, in the field of negligence it has been held that whether reasonable testing and inspection would have disclosed a product defect is a question for the jury to decide (*Putensen* v. *Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1076-1078 [91 Cal.Rptr. 319]), and we think a like principle applies in an action based upon a theory of strict product liability. In any event, JJP's appellate argument focuses upon the trial court's failure to instruct on the duty to warn, rather than the duty to test. This may be because, after West had rested and during a session in chambers, JJP's counsel said this: "There has been evidence on testing and I would admit that there certainly is enough evidence to raise an issue as to whether there was a duty to test. But the time by which that issue has to be weighed is February 28th, 1980. And it's a negligence standard, no matter how you look at it, whether you want to frame it in terms of negligence or strict liability."

advanced two theories of liability, viz., defective design and failure to warn. A jury rendered a general verdict for the plaintiff, and the judgment was affirmed on appeal. The opinion of the court of appeals contains no discussion of whether the plaintiff's theory of defective design was appropriate, because on appeal the defendant did not contest the sufficiency of the evidence to support the jury verdict on liability and causation. (*Id.*, at p. 616.) But the case nevertheless illustrates that the concept of defective design has been applied to a vaginal tampon.

In its closing brief JJP contends that West herself relied upon the theory of failure to warn, in that her counsel, in opening statement and in closing arguments, referred to the lack of warning. We pause to examine counsel's remarks.

In his opening statement to the jury, West's counsel mentioned the fact that after TSS had been identified, the Food and Drug Administration requested all tampon manufacturers to furnish warnings about TSS with their products. He went on to say that after West had recovered from her illness, JJP inserted such a warning in boxes of o.b. tampons. The relevant text of counsel's comments is set forth in the margin.[25] The thrust of those comments was that the warning itself was evidence that o.b. tampons were defective. The comments were proper. ■ In an action based on a theory of strict product liability, postaccident warnings are admissible to show that the product was defective at the time of injury. (*Schelbauer* v. *Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 449-452 [198 Cal.Rptr. 155, 673 P.2d 743].)

■ A little later in opening statement, counsel alluded to the instructions furnished by the manufacturer concerning the use of o.b. tampons.

---

[25]Counsel said this: "Now, interestingly enough, after Lynette's incident of toxic shock syndrome, Johnson & Johnson comes out with a warning, which used to be on the outside, but is now folded up in a little insert inside the product that says, 'Warning. Tampons have been associated with a rare but severe significant disease called toxic shock syndrome.' [¶] And the warning goes on to say that [if] you vomit or have a fever with these things in your body, or on your menstrual period, take them out and call your doctor right now. [¶] I'm sure someone in Lynette West's situation would have appreciated that warning. And I am sure that she would have appreciated it if the tampon manufacturers had thought a little bit about the woman's body before they marketed their product. But that didn't happen, and it took a request from the FDA to get that warning put in the boxes now. And it's in there today. [¶] So there is no question, there is going to be no question from the treating doctors, no question from the federal experts that Lynette West had toxic shock. No question the tampons caused toxic shock by creating a bacterial infection. No question. [¶] The companies in essence admitted it themselves because they are putting the information in their boxes."

The text of those remarks is also set forth in the margin.[26] In context, counsel was saying that the forthcoming evidence would show (1) that o.b. tampons were defective, and therefore dangerous, because the instructions for use aggravated other defects in design, and (2) that there could be no dispute as to whether use of an o.b. tampon caused TSS in this case. Counsel did not suggest that JJP had a duty to warn consumers of the danger of contracting TSS. Instead, he concentrated on the fact that the product had several defects. ■ "[I]n a strict liability case, as contrasted with a negligent design action, the jury's focus is properly directed to the condition of the product itself, and not to the reasonableness of the manufacturer's conduct." (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d at p. 434.)

■ The subject of instructions for use arose again in the course of counsel's argument to the jury.[27] Very shortly thereafter, counsel told the jury that his theory of the case was *not* based on JJP's failure to warn of the danger of TSS. Specifically, counsel said this: "But I want to make it clear that I don't think the defect in this product—I have heard this many times in this case. I categorically do not think that the defect in the product was somehow failure to warn about toxic shock syndrome. [¶] You are going to see as I develop in my argument—that is really sort of a silly argument. Mr. Gore proposed in his opening statement that somehow, I'm

---

[26]Counsel said: "Now let me make myself a little bit more clear on that last issue. It may be argued to you that the tampon, which is essentially cotton and rayon. I mean it's a fiber product. It's a pretty benign little piece of cotton. And I'm not going to dispute that for one minute. If you took that tampon and put it on the edge of that table just naked and bare there, without a box or instructions or anything else, it's not going to hurt anybody. You wouldn't sell very many, either, if they were selling them to put on the edge of a table. But they are not. They are selling them to put it [*sic*] in a woman's body. [¶] In order to do that, they have to put it in a box and give you instructions for [its] use. I submit to you in this case, the evidence is going to show that there aren't two answers to the question of whether or not it was defective, because it was defective in that the instructions they gave to use that tampon made it quite dangerous, when you follow those instructions, don't change it unless you absolutely need to. Let it collect all the blood it can. Let those bacteria grow and grow and grow. [¶] Those instructions, along with others, coupled with that tampon's capacity to hold fifty percent more menstrual discharge than the other stuff that had been on the market beforehand, made that thing exceedingly dangerous. And I don't think there is any dispute on that. [¶] If you look at the Johnson & Johnson box today, and you will see several examples of them in this case, there are going to be warnings about the dangers of toxic shock syndrome. So I don't think there is any question on defect."

[27]Counsel said: "I anticipate the defendants are going to tell you that the product is that wad of cotton we call a tampon. Before they tell you that and tell you it's benign, can't possibly cause an injury, I'm going to tell you that it's my theory of the case that their product consists of not only the tampon itself, what it is made of, how it was made, but also the instructions they provided for its use and the package they put it in. [¶] And I'm going to tell you also that it is our theory of the case, and I think the evidence is absolutely unquestioned on those points that that product had a series of defects. [¶] Beginning in about 1977, their entire product line from the o.b. regular to super to super plus was too absorbent. They were encouraging women to leave it in too long by their very instructions. And women were getting infections."

arguing there is a defect because they failed to warn about toxic shock. [¶] Toxic shock is a disease entity that wasn't defined until after Lynette West was released from the hospital. The federal government didn't uncover the disease problem with tampons until after she went to the hospital. It's silly to argue that they somehow should have warned about the disease, before the Feds blew the whistle. [¶] I can't make that argument to you, and I'm not going to make that argument to you."

Counsel went on to point out that the warning inserted in boxes of o.b. tampons—the warning requested by the Food and Drug Administration— was contrary to JJP's position that o.b. tampons could not cause TSS. Counsel's point was this: "Now, I ask you, if the tampon manufacturer had a serious question as to whether or not their product was associated with toxic shock syndrome, absent a federal court order, why would they put that [warning] in their tampon box? [¶] I submit to you that it is an admission that people—that they know, and they are telling the consuming public that their tampons lead to this disease."

Counsel then argued that under the "consumer expectation" test, an ordinary consumer of o.b. tampons would not expect to "get sick from the product."[28] His point was that a packaged o.b. tampon was innocuous in appearance, and that the advertising on the back of the package extolled the virtues of the product.[29]

In sum, in opening statement and in argument West's counsel made (among others) three points: (1) That the subsequent warning about TSS furnished by JJP in boxes of o.b. tampons was itself evidence that o.b. tampons were defective at the time of West's illness; (2) that the directions for use of o.b. tampons constituted a defect because they at once extolled

---

[28]Counsel argued: "I don't think any reasonable consumer in this state, any female, would expect to get toxic shock syndrome from a tampon, particularly from a tampon where the manufacturer has told you it keeps you safer longer. [¶] I don't think, if you looked at this box on the shelf in 1980, you would be led in any way to believe you might get sick from the product. [¶] Remember, this information about toxic shock syndrome does not appear in any tampon boxes from Johnson & Johnson until late 1980, many months after Lynette West was sick. [¶] Take a look. This is a blow up of the back portion of the box that Lynette West had in her possession at the time her doctors told her she had T.S.S. I think that is Plaintiff's Exhibit One. [¶] Take a look at the box. Take a look at the information in the box. You are not going to see anything about T.S.S."

[29]The text on the back of plaintiff's exhibit 1 read as follows: "The o.b. Method . . . designed by a woman gynecologist and Johnson & Johnson to keep you safer, longer. [¶] Absorbs 50% more. Outer layers absorb and transmit fluid to inner holding layers to give you 50% more absorbency than the leading brand. [¶] Gap-free protection against staining accidents. Highly compressed layers expand in width to give you a gap-free snug fit. [¶] Natural insertion so you know it's right. With the fingertip indentation, you are able to position o.b. better than an applicator. [¶] Three sizes of o.b.—one is sure to be right for you. o.b. Regular is for average flow. Easy to follow instruction leaflet enclosed."

and exacerbated their "super-absorbent" attributes (another claimed defect); and (3) that an ordinary consumer of o.b. tampons would not expect to become seriously ill from using them. Counsel's remarks were not, as JJP claims, directed toward failure to warn, but rather toward defect in design and "consumer expectations."

■ Whether a particular product is defective in design is a question of fact for the jury to determine. (*Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 6 [116 Cal.Rptr. 575].) "An attorney is permitted to argue to the jury any theory of the evidence of which it is reasonably susceptible." (*Fleming* v. *Fricke* (1934) 140 Cal.App. 14, 35 [35 P.2d 210].) As noted *ante* in part IV B of this opinion, substantial evidence was presented in this case to show that o.b. tampons were defective in design. In view of that evidence we cannot say that West's theory of defective design was without support. ■ Where substantial credible evidence is presented, a jury's verdict on defective design will not be disturbed on appeal. (*Self* v. *General Motors Corp.*, *supra*, 42 Cal.App.3d at p. 6.)

■ Even if JJP's requested instructions on failure to warn had been given in addition to the instructions on design defect, the jurors could well have found JJP liable on the basis of design defect, even if they concluded that it was not liable for failing to give an adequate warning about TSS. It does not appear reasonably probable that JJP would have obtained a more favorable result if its requested instructions had been given. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].)

Consequently we perceive no error either (a) in allowing West to proceed on the theory of defective design, or (b) in rejecting JJP's instructions on failure to warn. If error there was, it was not prejudicial.

## VI. PROXIMATE CAUSE

■ JJP next contends that West "failed to adduce proof of a prima facie case of proximate causation" because "there was no evidence that [she] read . . . or followed the o.b. tampon instructions." In particular, JJP argues that West failed to prove that her injury would have been prevented by either (a) different instructions on the use of the o.b. tampon, or (b) any warning about the hazard of TSS.

First, we question the evidentiary premise upon which the argument is based. It is true that there was no direct testimony to the effect that West read the instructions; the question was never put to her. But West testified (1) that she had tried other tampons; (2) that she preferred the o.b. tampon

because "the material was more compact" and because "it could stay in longer, and I wouldn't have to worry about it"; and (3) that at the time of her illness, she had been using o.b. tampons for close to five years (i.e., since about age 15). An insert from a package of o.b. tampons was admitted in evidence as part of plaintiff's exhibit 1. The insert contained not only instructions on how to use an o.b. tampon, but also a description of the tampon's attributes. Part of the description read: "o.b. is designed with special outer absorbing and inner holding layers. This method of layering a tampon enables o.b. to absorb twice as fast and hold over 50% more than the leading tampon brand. [¶] Even on heaviest days when you lose almost half your menstrual flow, o.b. keeps you safer, longer than any other tampon." The instructions themselves illustrated to the user the proper method of "flaring" one end of an o.b. tampon prior to insertion. From this evidence and from West's testimony, the jurors could reasonably have surmised that at some point in her life, West had read the instructions.

Second, the argument ignores the evidence that actually was presented on the issue of proximate cause. As noted in part IV B of this opinion, *ante,* there was substantial credible testimony to the effect that the use of tampons is a substantial factor in the occurrence of menstrually associated TSS. One expert said without reservation that an o.b. tampon caused West's illness. The testimony of one witness, if believed, is sufficient for the proof of any fact. (Evid. Code, § 411.)

## VII. Consumer Complaints

At trial one of West's experts was allowed to testify about the nature of the consumer complaints JJP had received concerning the o.b. tampon, and to give his opinion as to JJP's reaction to those complaints. At the outset of the testimony the trial court told the jury that the evidence was being admitted solely on the issue of whether JJP had received notice of defects in its product. Initially, the witness not only described the general nature of the complaints, but also read from portions of them. The testimony was interrupted by a conference held in chambers, in the course of which the trial court ruled (1) that the written consumer complaints themselves would not be admitted in evidence, and (2) that the witness should thenceforth refrain from reading the complaints verbatim. Thereafter the witness adhered to the trial court's rulings. We already have described the consumer complaints *ante* in part III D of this opinion.

JJP now contends that the admission of the expert's testimony was prejudicial error, because (1) the consumer complaints could not have, and did not, alert JJP to the hazard of TSS, which was unknown at the time; and (2) the verbatim reading of portions of the complaints was unduly inflam-

matory. In support of its contention, JJP cites *Wolf by Wolf* v. *Procter & Gamble Co.* (D.N.J. 1982) 555 F.Supp. 613.

*Wolf* was an action for damages for personal injuries sustained as the result of contracting TSS while wearing another brand of tampon. We note that the opinion concerns rulings made *in limine* on the admissibility of certain evidence. The court there ruled *prior to trial* that evidence of consumer complaints of "rashes, allergic reactions, vaginitis, irritation, burning, disintegration of the tampon, ulcerations, and lacerations would not serve to put defendants on notice of a defect in their product such as to cause the complex illness that is the subject of this litigation." (*Id.*, at p. 622.) Because there was no trial record, we cannot evaluate the connection, if any, between the consumer complaints and the defect which was in issue in *Wolf.*

On the other hand, in *Kehm* v. *Procter & Gamble Mfg. Co.*, *supra*, 724 F.2d 613, 625-626, the trial court admitted evidence of consumer complaints which, though they all related to tampons, failed to mention TSS. On appeal from a judgment based on a verdict for the plaintiff, the defendant manufacturer contended that the admission of such evidence was reversible error. The court of appeals disagreed, and said this: "In this case, consumer complaints need not match the exact scientific description of TSS in order to show substantial similarity between other consumers' illnesses and Mrs. Kehm's illness. Procter & Gamble had ample opportunity, of which it availed itself, to rebut the force of the other complaints by pointing out dissimilarities between the complainers' symptoms and the symptoms of TSS. It was up to the jury to decide what weight to give the complaints from other consumers." (*Id.*, at pp. 625-626.)

As of this writing, there appears to be no California decision directly on point. Both *Wolf* and *Kehm* are decisions of federal courts lower than the United States Supreme Court, and neither decision is binding on us. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 674, pp. 4587-4588, and cases there cited.) But we find the *Kehm* opinion persuasive on this point, because it appears to be in accord with previous California law. For example, in *Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113, 121-122 [117 Cal.Rptr. 812, 528 P.2d 1148], it was held: "Evidence of other accidents is admissible to prove a defective condition, knowledge, or the cause of an accident, provided that the circumstances of the other accidents are similar and not too remote." And in *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 404 [185 Cal.Rptr. 654, 650 P.2d 1171], we encounter the following paragraph:

"When evidence is offered to show only that defendant had notice of a dangerous condition, the requirement of similarity of circumstances is re-

laxed: ' "all that is required . . . is that the previous injury should be such as to attract the defendant's attention to the dangerous situation. . . ." ' (*Laird* v. *T. W. Mather Inc.* (1958) 51 Cal.2d 210, 220 [331 P.2d 617].)"

We note that in *Kehm* the court of appeals approved the admission in evidence of the actual documents containing the consumer complaints. (*Kehm* v. *Procter & Gamble Mfg. Co., supra,* 724 F.2d at pp. 625-626.) In this case, the trial judge admitted testimony about the documents, but refused to allow the documents themselves to be admitted in evidence. Apparently the trial judge attempted to draw a line in accord with the provisions of Evidence Code section 352. Technically, the consumer complaints probably embodied a good deal of hearsay. Evidence about the complaints was admissible, if at all, only to show that the complaints had in fact been made. But in order to demonstrate the relevance of the complaints, some description of them had to be given; otherwise, the jury would have been told simply that "consumer X complained about o.b. tampons," without more. Therefore the trial judge allowed the witness to describe the nature of the complaints and, as a part of the description, to read excerpts from pertinent ones.

The consumer complaints formed the basis of an expert's opinion. Based on his review of the complaints, the expert testified that JJP should have initiated an "adequate appropriate testing program," and that if testing had been done in 1977 or 1978, "we certainly would have seen toxic shock much earlier than we saw it." An expert is entitled to base his opinion on evidence which is not itself admissible. (Evid. Code, § 801, subd. (b).)

JJP had ample opportunity to point out the dissimilarities between the complainants' symptoms and the symptoms of TSS. For example, one of JJP's experts (a physician) testified that in his opinion there was "no relationship" between TSS and vaginitis, or cystitis, or monilia, or salpingitis. Another witness (a microbiologist) testified that the letters did not indicate the need for any further testing of o.b. tampons.

JJP made no request for a limiting instruction, to the effect that matters on which an expert based his opinion were admitted only to show the basis of the opinion and not for the truth of the matter. (See *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 789 [174 Cal.Rptr. 348].)

In the light of the foregoing circumstances, we conclude that the trial court committed no error in admitting testimony about the consumer complaints.

## VIII. ALLEGED MISCONDUCT OF COUNSEL

██ Next, JJP contends that West's counsel exceeded "the bounds of proper advocacy" in the course of the trial. In particular, JJP complains of counsel's continued reference to JJP as "Johnson & Johnson," of his description of JJP as "old and big and very successful," of his suggestion that JJP had to be dragged "kicking and screaming into the courthouse," and of other comments of the same ilk. JJP also complains that on two occasions, West's counsel asserted facts which were not supported by any evidence, and that he attempted in effect to testify himself.

We need not recite counsel's comments at length. We have examined each of the allegedly offending episodes in detail, and have noted the following:

First, the trial was not a short one. Opening statements began on December 1, 1982, and closing arguments ended on December 16. A handful of suspect comments was spread over a period of 13 court days. With the exception of the reference to "Johnson & Johnson," the comments were isolated and were not repeated. The reference to "Johnson & Johnson" cannot have worked to the prejudice of JJP since, after all, "Johnson & Johnson" is a part of JJP's full corporate name, "Johnson & Johnson Products, Inc."

Second, in the majority of the instances of which JJP complains, JJP's counsel raised no objection. Even when an objection was interposed, JJP's counsel made no request for an admonition to the jury. ██ " 'Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection *and a request that the jury be admonished.* . . . In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice.' " (*Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 891-892 [112 Cal.Rptr. 540, 519 P.2d 588], quoting from *Horn* v. *Atchison T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561], cert. den. (1965) 380 U.S. 909 [13 L.Ed.2d 796, 85 S.Ct. 892], italics ours.) If there is no request that the jury be instructed to disregard the objectionable conduct, the error is deemed waived unless the conduct was of such an aggravated character that it could not be cured by any instruction. (*Id.,* at p. 892.)

██ Third, when an objection was made, it was often sustained; and while no admonition was given to the jury, an admonition occasionally was given to West's counsel. Counsel heeded the admonishment.

Fourth, on occasion West's counsel himself recognized that he had stepped over the line, and he apologized to the court.

Fifth, misconduct of counsel was one of the grounds upon which JJP's motion for new trial was based, and "the trial court impliedly found no misconduct, or at least no prejudice, when ruling on the motion for new trial. 'A trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and his conclusion in the matter will not be disturbed unless, under all the circumstances, it is plainly wrong.'" (*Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 407 [196 Cal.Rptr. 117], quoting from *Cope* v. *Davison* (1947) 30 Cal.2d 193, 203 [180 P.2d 873].)

 From our examination of the record, we cannot say that West's counsel was overly blatant, or that he proceeded in bad faith, or that he disregarded standards of professional conduct. In the odd sentence or two he may have been overzealous, but he retreated quickly. The trial judge exercised firm control over the conduct of the trial, and he instructed the jurors that the statements of counsel were not to be considered as evidence.

We find no prejudice to JJP, and no miscarriage of justice.

## IX. INSTRUCTIONS

We now turn to JJP's claims of error regarding the instructions actually given to the jury.

### A. *The "Consumer Expectation" Instructions*

 At West's request the trial court gave an instruction which was based upon, but omitted portions of, BAJI No. 9.00.5. The exact wording of the instruction given is set forth in the margin.[30] The court also instructed the jury that West had the burden of proving that the o.b. tampon manufactured by JJP "was defective in that it failed to perform as safely as an ordinary consumer would expect."

In *Barker* v. *Lull Engineering Co.*, *supra*, 20 Cal.3d 413, the California Supreme Court set forth two tests for determining whether a product is defective in design. The tests subsequently have become known as the "consumer expectation" test and the "risk-benefit" test. The tests are described in *Barker* as follows: "We hold that a trial judge may properly

---

[30]The instruction read as follows: "The manufacturer of a product is liable for injuries a proximate cause of which was a defect in its design which existed when it left possession of defendant provided that the injury resulted from a use of the product that was reasonably foreseeable by the defendant. [¶] A product is defective in design if the product failed to perform as safely as an ordinary consumer of the product would expect when used in a manner reasonably foreseeable by the defendant."

instruct the jury that a product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove, in light of the relevant factors discussed above, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id.*, at p. 435.) The two tests are *alternative* tests. (*Id.*, at p. 432; accord *Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 118 [184 Cal.Rptr. 891, 649 P.2d 24].)

 JJP now contends that the trial court erred in giving an instruction based on the "consumer expectation" test described in *Barker.* According to JJP, the court should have instructed the jury to apply the "risk-benefit" test instead.

To this argument there are two short answers. First, there is absolutely nothing in the record which indicates that JJP requested an instruction based on the "risk-benefit" test. " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' " (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 950-951 [160 Cal.Rptr. 141, 603 P.2d 58], quoting from *Downing* v. *Barrett Mobile Home Transport, Inc.* (1974) 38 Cal.App.3d 519, 523 [113 Cal.Rptr. 277].) Neither a trial court nor a reviewing court is obligated to seek out theories which a party might have advanced, or to articulate for him that which he has left unspoken. (*Finn* v. *G. D. Searle & Co.* (1984) 35 Cal.3d 691, 701-702 [200 Cal.Rptr. 870, 677 P.2d 1147].)

 Second, under the "risk-benefit" theory a manufacturer has the burden of proving that the benefits of the product's design outweigh the risk of danger inherent in the design. (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d at pp. 431-432, 435.) In applying the "risk-benefit" test a jury is entitled to consider, among other things, the "feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (*Id.*, at p. 431.) Here, JJP produced no evidence to show (1) that a safer alternative design of the o.b. tampon was not feasible, or (2) that the cost of a different design would have been prohibitive, or (3) that any different design of the o.b. tampon would have been more dangerous to the consumer. Consequently, even if an instruction based on the "risk-benefit" test had been requested, it would have been inappropriate because it had no support in the evidence.

JJP persists, and in its closing brief contends that "the consumer expectation test is not appropriate in a case requiring the presentation of expert testimony," citing *Lunghi* v. *Clark Equipment Co.* (1984) 153 Cal.App.3d 485 [200 Cal.Rptr. 387].

*Lunghi* was an action for wrongful death brought by the heirs of a man who had been crushed by parts of a front-end loader. The action was based on theories of negligence and strict product liability. The trial court refused instructions based on the "consumer expectation" test, and instead instructed the jury to apply the "risk-benefit" test. The jury returned a verdict in favor of the defendant manufacturer, and a judgment was entered accordingly. On appeal the plaintiffs claimed error in (among other things) the trial court's refusal to instruct on the "consumer expectation" test. On that point the First Appellate District, Division Three, found no error.[31] It said: "Appellants themselves identify the subject of inquiry in the instant case as 'whether the user of a loader would expect that boom arms and bucket could descend with fatal crushing force when the loader is at rest with the engine off.' This does not seem to be the kind of question that twelve ordinary people drawn from the community at large could evaluate based on their own 'common knowledge.' The 'user of a loader' is distinguishable from 'ordinary consumers.' [Citation.] Frankly, we think that an ordinary consumer would not know what to expect from a piece of heavy machinery like the Bobcat loader, even if the engine was turned off." (*Id.,* at p. 496.)[32] The court's conclusion was based upon its interpretation of certain language found in *Campbell* v. *General Motors Corp., supra,* 32 Cal.3d 112, 126-127.

In *Campbell,* a 62-year-old female bus passenger was injured when a bus manufactured by the defendant turned a corner sharply, and she was propelled from her seat. In a subsequent product liability action, the plaintiff claimed that the bus had been defective in design because it had lacked handrails or guardrails which would have prevented her fall. In her case in chief the plaintiff testified to what had happened, and she presented photographs of the bus in question. At the close of her case in chief the trial court granted the manufacturer's motion for a nonsuit. The Supreme Court reversed, holding that the plaintiff had presented sufficient evidence, under either the "risk-benefit" or "consumer expectation" test, to withstand a motion for nonsuit. Under the "consumer expectation" test, it was not necessary for the plaintiff to present expert testimony as to design defects. The

---

[31]However, the judgment was reversed on other grounds.

[32]Similar language was used by the First Appellate District, Division Two, in *Bates* v. *John Deere Co.* (1983) 148 Cal.App.3d 40, 52 [195 Cal.Rptr. 637], where the product was a commercial cotton picking machine.

court said: "Here, plaintiff presented sufficient evidence to have the case submitted to the jury on this theory as well. Not only did she testify about the accident (her use of the product), but she also introduced photographic evidence of the design features of the bus. This evidence was sufficient to establish the objective conditions of the product. The other essential aspect of this test involves the jurors' own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence. Since public transportation is a matter of common experience, no expert testimony was required to enable the jury to reach a decision on this part of the *Barker* inquiry." (*Id.*, at p. 126; fn. omitted.) The court noted that "it is difficult to conceive what testimony an 'expert' could provide" on the issue of "the safety expectations of the general public as represented by the ordinary consumer . . . ." (*Id.*, at pp. 126-127.) The court concluded thus: "The quantum of proof necessary to establish a prima facie case of design defect under the first prong [i.e., the 'consumer expectation' test] of *Barker* cannot be reduced to an easy formula. However, if the product is within the common experience of ordinary consumers, it is generally sufficient if the plaintiff provides evidence concerning (1) his or her use of the product; (2) the circumstances surrounding the injury; and (3) the objective features of the product which are relevant to an evaluation of its safety. That evidence was provided in this case." (*Id.*, at p. 127.)

Our brethren of the First Appellate District evidently read the quoted language from *Campbell* to say that the "consumer expectation" test should not be applied where the product in question is beyond the ken of the ordinary person on the street. We do not so read it. Nor do we read it to say that the "consumer expectation" test cannot be used in a case where expert testimony is presented. Instead, we read it to say simply that the plaintiff in *Campbell* was entitled to establish, and did establish, a prima facie case of failure to meet "consumer expectations" without the benefit of expert testimony, because public transportation is a matter of common experience.[33]

 In the light of the evidence, we think the "consumer expectation" test was entirely appropriate in this case. The o.b. tampon was not a new product; in 1980 o.b. tampons had been distributed nationally for about three years, and West had been using them for close to five years. Any user

[33]Our view is reinforced by the opinion in *Barker* v. *Lull Engineering Co.*, *supra*, 20 Cal.3d at pages 419 and 435. In *Barker* the product was a 23-foot-long 4-wheel-drive loader, weighing 17,500 pounds and equipped with forks similar to those of a forklift. After setting forth the "consumer expectation" and "risk-benefit" tests, the Supreme Court reversed the judgment and remanded the case to the trial court for possible retrial. The opinion contained no instructions to the trial court as to which test should be applied on retrial. We surmise that the Supreme Court intended that the trial court should exercise its discretion in applying either test, depending upon the state of the evidence on retrial. The inference is that the "consumer expectation" test could be applied to the product in question.

of an o.b. tampon, including West, could reasonably expect, and had every right to expect, that use of the product would not lead to a serious (or perhaps fatal) illness. West used an o.b. tampon and became seriously ill. Experts testified that the tampon was defective in design, and that its use was, at the very least, a substantial factor in causing her illness. From such evidence the jury reasonably could conclude that the tampon had failed to meet consumer expectations as to its safety.

We find no error in the giving of instructions based upon the "consumer expectation" test.

## B. *Instructions on Punitive Damages*

The trial court gave two instructions on the issue of punitive damages. Except for one minor modification, the instructions were exact copies of BAJI Nos. 14.71 and 14.72 (both as revised in 1981). JJP does not quarrel with the wording of the instructions given. Instead, it complains that the instructions should not have been given because there was no evidence to support them. The thrust of the argument seems to be that "there was no proof that JJP knew or could have known [in early 1980] that any tampon caused TSS, much less that its own o.b. might be associated with that illness." In other words, JJP contends that because TSS was both unknown and unknowable before West's injury occurred, it cannot be said that JJP acted in conscious disregard of the safety of West or of any other person. (See *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 32 [122 Cal.Rptr. 218].)

On the other hand, West contends that punitive damages were properly in issue because (1) JJP knew that during menstruation a vagina is potentially a breeding ground for pathogenic bacteria; but (2) despite such knowledge, JJP did not conduct adequate testing of the o.b. tampon before marketing it throughout the United States; and (3) having received continuing complaints from consumers about infections resulting from the use of o.b. tampons, JJP did no further studies to determine whether use of the tampon could promote such infections.

"Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury; *Davis* v. *Hearst* (1911) 160 Cal.143, 173 [116 P. 530], declares them to be 'wholly within the control of the jury.'" (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 821 [169 Cal.Rptr. 691, 620 P.2d 141], app. dism. and cert. den. (1980) 445 U.S. 912 [63 L.Ed.2d 597, 100 S.Ct. 1271].) In the field of strict products liability, the existence of "malice"—in the sense of "conscious disregard for the safety of others"—has been held to be a question

of fact for the jury to determine. (*Hilliard* v. *A. H. Robins Co.*, *supra*, 148 Cal.App.3d 374, 396-398.) Similarly, in the field of negligence it has been held that whether reasonable testing and inspection would have disclosed a product defect is a question of fact for the jury to decide. (*Putensen* v. *Clay Adams, Inc.*, *supra*, 12 Cal.App.3d 1062, 1076-1078.) These principles, including the latter, apply here.

The case of *Hilliard* v. *A. H. Robins Co.*, *supra*, 148 Cal.App.3d 374 is illustrative. There the plaintiff contracted pelvic inflammatory disease from using an intrauterine device known as the Dalkon Shield and manufactured by the defendant Robins. The plaintiff's action against Robins and others was based in part on a theory of strict product liability. At trial some of her evidence on the issue of punitive damages was admitted, while other evidence was rejected. After all parties had rested their respective cases, the trial court "bifurcated" the plaintiff's claims for punitive damages, and refused to let them go to the jury unless and until the jury awarded the plaintiff compensatory damages against Robins. The jury did so. Then the trial court granted defendant Robins' motion for a directed verdict on the issue of punitive damages. The Court of Appeal held that the granting of the motion was error; it reversed that part of the judgment, but affirmed in all other respects.

The Court of Appeal held that the plaintiff had presented "substantial, competent, admissible, relevant evidence" on the issue of punitive damages. (*Hilliard* v. *A. H. Robins Co.*, *supra*, 148 Cal.App.3d at p. 398.) Part of that evidence showed (1) that Robins had had reports from its own employees, as well as other "significant information," about "infections" caused by use of the Dalkon Shield, and (2) that Robins nevertheless elected to continue to market the device without any change. (*Id.*, at p. 397.)[34] The Court of Appeal also held that the trial court had erred in refusing to allow the plaintiff to present "evidence that the state of the art in testing medical devices such as an IUD required long term animal studies." (*Id.*, at p. 398.) And in a footnote, the court said: "We also recognize that plaintiff presented substantial evidence of a conscious decision by defendant Robins not to test the IUD device prior to or during marketing. We do not reject this conduct by defendant as a basis for an award of punitive damages to plaintiff." (*Id.*, at p. 398, fn. 21.)

---

[34]There also was evidence which showed (1) that Robins knew that the Dalkon Shield tended to "migrate" from the vagina into the uterus; (2) that Robins knew that the device was hard to detect by means of x-rays; (3) that Robins did "practically nothing" to correct these problems; and (4) "that Robins knew of a large number of cases of serious pelvic inflammatory disease, of perforations, spontaneous abortions and other serious complications associated with the use of the Dalkon Shield." (*Id.*, at pp. 397-398.) Of course, these elements are not present in this case. We do not mean to suggest that the *Hilliard* case is identical to this one. We merely suggest that it is "illustrative," i.e., it provides guidance.

In this case there was testimony to the effect that JJP's premarket testing of the o.b. tampon was inadequate. Part of the criticism focused on JJP's failure to perform adequate clinical experiments and adequate studies with animals. In JJP's files there was little to show that JJP had made any significant inquiry into the bacterial count of the vagina. One of West's experts testified that any manufacturer who disregarded such bacterial count committed "an act of unbelievable irresponsibility." The same expert testified that JJP's failure to investigate the hazards of digital insertion of the o.b. tampon was "obviously in total disregard to the public safety and welfare in my opinion." He further testified that JJP's instructions on how to use an o.b. tampon constituted "an absolutely unbelievable thing."

In addition, there was evidence that JJP had received continuing consumer complaints about the o.b. tampon from 1975 through the end of 1979. Another of West's experts testified that in the face of such complaints, JJP should have undertaken "an adequate appropriate testing program." JJP's failure to investigate whether o.b. tampons caused vaginal infections was, in his words, "conscious, and in my professional opinion as a microbiologist, this was disregarding a very serious problem." He testified that JJP had a "scientific obligation to attempt to determine whether or not their tampon was causing these reactions," and "my professional opinion is that they completely ignored it." About the studies JJP actually did, he said, "I think they have seriously flubbed. They missed major areas they should have addressed."

There also was testimony to the effect that the CDC, virtually unassisted, established within a period of three to four weeks (1) a close statistical association between tampon use and menstrually related TSS, and (2) the relationship between staphylococcus aureus and TSS.

All of the foregoing was substantial, competent and relevant evidence. From such evidence the jury could reasonably have concluded (1) that adequate testing would have revealed an association between tampon use and vaginal infection, and ultimately between such use and menstrually related TSS; (2) that JJP's testing was inadequate; (3) that JJP's decision not to do any further testing, even when faced with continuing consumer complaints, was a conscious one; and (4) therefore, JJP acted in conscious disregard of the safety of others.

Furthermore, we note that the issue of whether the instructions on punitive damages were supported by the evidence was raised below in connection with JJP's motions for new trial and for judgment notwithstanding the verdict. The trial court found that the amount of "[p]unitive damages awarded by the jury [was] grossly excessive," but it did not find that such dam-

ages were unwarranted. To the contrary, the court specifically ruled: "However, under the definition of malice set forth in BAJI #14.71, to wit: conduct carried on by defendant with a conscious disregard for the rights and safety of others, substantial evidence against defendant was presented at trial by plaintiff primarily through the testimony of Dr. Tierno and Dr. Hanna." "Although the trial court's determination [on a motion for new trial] is not binding upon a reviewing court, it is to be accorded great weight because having been present at the trial, the trial judge was necessarily more familiar with the evidence." (*Moore* v. *American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 642 [197 Cal.Rptr. 878]; accord *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 387-388 [202 Cal.Rptr. 204].)

As further authority for the proposition that the punitive damage instructions ought not to have been given, JJP points to *Kehm* v. *Procter & Gamble Mfg. Co., supra,* 724 F.2d 613, a case which we already have mentioned in parts V and VII of this opinion, *ante.* While we have found the *Kehm* opinion illuminating on two points, we do not find it persuasive on this one, for the following reasons:

First, while the jurors in *Kehm* apparently were instructed on the issue of punitive damages, they chose not to award such damages.[35] Second, in reviewing the evidence, the court of appeals concluded that "the record shows that by the end of the trial, the Kehms had failed to demonstrate Procter & Gamble's 'complete disregard' for Mrs. Kehm's rights." (*Id.,* at p. 623.) Third, the opinion does not reveal any expert testimony to the effect that the defendant there acted in conscious disregard of the safety of others.

We conclude that in the instant case substantial evidence warranted the giving of instructions concerning punitive damages.

■■■■ In connection with its argument about such instructions, JJP further contends that the trial court erred in allowing the jury to hear evidence of the financial status of its *parent* corporation, Johnson & Johnson, Inc. To evaluate this claim of error, we pause to examine certain events at trial.

West's counsel issued a subpoena to the parent corporation, Johnson & Johnson, Inc., to appear at trial and to produce documents showing its net worth. JJP's counsel filed objections to the subpoena, but the objections

---

[35]*Kehm* was an action for wrongful death brought by the heirs of the decedent. In California, punitive damages may not be recovered in an action for wrongful death. (*Ford Motor Co.* v. *Superior Court* (1981) 120 Cal.App.3d 748, 751 [175 Cal.Rptr. 39], hg. den. (Sept. 16, 1981.)

were not heard before trial. A witness named Robert Christensen,[36] described in West's brief as "staff counsel for Johnson & Johnson, Inc.,"[37] appeared at trial. West's counsel planned to elicit from Mr. Christensen testimony concerning the net worth of the parent corporation. During the testimony of West's final witness a recess was taken, and a discussion took place in chambers between court and counsel. In the course of that discussion the trial court ruled that West had established, up to that point, a prima facie case for punitive damages, and further ruled that the net worth of the parent corporation could be admitted in evidence. Without waiving objections to those rulings, JJP's counsel then offered to stipulate to the net worth of the parent corporation (i.e., Johnson & Johnson, Inc.) in order to avoid having Mr. Christensen called to the witness stand.[38] Ultimately counsel for both sides stipulated in front of the jury to the following: "Your honor, the stipulation is as follows: Johnson & Johnson Products, Inc., the defendant in this case, is a wholly owned subsidiary of the parent company, Johnson & Johnson, Incorporated. The second part of the stipulation, the net worth, that's assets minus liabilities of Johnson & Johnson, Inc., is two billion two hundred forty-nine million dollars."

JJP now asserts that "there was no justification for parading before the jury the huge net worth of Johnson & Johnson ($2.249 billion)." As an abstract proposition, in another context, the assertion might have merit. But in this case the trial court plainly ruled that West had established a prima facie case for punitive damages. For reasons already discussed at length, we believe the court's ruling was correct. At that point JJP should have produced evidence of *its own* financial status. ▮▮▮ "[I]t is consonant

---

[36]We here adopt the court reporter's spelling of Christensen's name. In their briefs the parties have spelled his name variously as "Christianson" or "Christiansen."

[37]Mr. Christensen did not testify. In the trial record he is identified as "an attorney in the general counsel's office." In its closing brief, JJP does not quarrel with West's description of Mr. Christensen's position.

[38]The record discloses the following colloquy:

"THE COURT: Well, the ruling is going to be, counsel, that the wealth or the net worth or the assets of Johnson & Johnson, you can get that in, with the understanding that any judgment or any verdict is strictly against Johnson & Johnson Products, Inc., the named defendant here.

"MR. ELLIOTT [West's counsel]: I understand, your honor.

"MR. PREUSS [JJP's counsel]: You're making a ruling that the net figure of Johnson & Johnson, Inc., the parent of [JJP] is to come into evidence? Is that your ruling?

"THE COURT: Yes, because I, at this point, feel that the necessary prima facie case has been made for punitive damages.

"MR. PREUSS: All right, your honor. Then in that case, without any—you know, with our objection to that, we will stipulate that the annual report of J & J, Inc. can come in. But that the only figure that can go to the jury is the net worth statement, so we don't have to bother with Mr. Christensen."

At a later point, counsel for both sides stipulated in chambers that instead of allowing the jury to see the annual report, they would stipulate to the net worth of the parent corporation.

with stare decisis and consistent with the modern trend to require the wrong-doer to demonstrate at the trial level that a particular award of punitive damages will exact too great a penalty because of [its] financial condition. . . . The defendant is in the best position to provide the most accurate data concerning its financial condition, and need not decide whether to introduce such information until after the plaintiff has presented a sufficient case for the punitive damages issue to go to the trier of fact. If the defendant wishes to challenge an award of exemplary damages on appeal, its production of financial data will provide the basis for appellate review . . . ." (*Vossler* v. *Richards Manufacturing Co.* (1983) 143 Cal.App.3d 952, 964 [192 Cal.Rptr. 219], hg. den. (Sept. 7, 1983.) "[T]he plaintiff has no obligation to introduce evidence of the defendant's financial condition when seeking punitive damages." (*Id.*, at p. 965.)

 Since JJP introduced no evidence at trial concerning its own financial status, and since the trial court ultimately ruled that nine-tenths of the original punitive damage award should be remitted, JJP has not demonstrated any prejudice.

C. *Instruction on Willful Suppression of Evidence*

 The trial court read to the jury an exact copy of BAJI No. 2.03, relating to the willful suppression of evidence. Once again, JJP does not quarrel with the wording of the instruction; instead, it contends that "there was no evidence to warrant this instruction." This contention requires a further examination of the record.

It appears that the instruction was given because the trial court concluded that JJP had intentionally withheld certain research notebooks. Prior to trial, West's counsel made a demand for the production and inspection of certain documents, including "writings which relate to or mention the testing . . . of [o.b.] tampons and/or related tampon products marketed by Johnson & Johnson." Counsel also propounded interrogatories, one of which read: "Please describe the types of tests which were done on [o.b. tampons] and/or other related tampon products prior to marketing, including the dates the tests were done, and the results of the same." JJP's response was the same in each case: it offered to make all of its records available for inspection at its headquarters in New Jersey. West's counsel duly repaired to New Jersey, inspected close to 9,500 documents, and arranged to have about 6,000 of them copied and shipped to his office in California.

Then JJP disclosed that Dr. Kenneth Kraskin would be a potential expert witness at trial. West's counsel promptly noticed the taking of Kraskin's deposition.

Meanwhile, West's counsel moved to compel further answers to his interrogatories and requests for production. In response, JJP provided further answers, one of which read: "Johnson & Johnson Products, Inc., has identified and produced for plaintiff's inspection and copying all records which pertain to the testing of o.b. tampons. No list of the types of tests, the dates of tests or the results of tests exists for which reason plaintiff was permitted to inspect and copy whatever testing records she desired . . . ." Once further answers were supplied, West's counsel withdrew his motion to compel from the court calendar.

Less than two weeks before trial,[39] Kraskin and another witness were deposed. In the course of those depositions West's counsel learned for the first time of the existence of the research notebooks. He made a request for their production. In reply counsel for JJP agreed to inquire about the notebooks, but hedged on producing them. The exact dialogue is set forth in the margin.[40]

Copies of Kraskin's 1975-1976 studies of the "acidified" o.b. tampon were delivered to West's counsel the day before the trial began. But the research notebooks, containing data accumulated during his 1971-1973 background studies, were never produced.

At trial Kraskin testified at some length about the research done at PPC during the years 1971-1973. He also testified that in doing the experiments with the "acidified" o.b. tampons, he relied on his earlier research data. He further testified that he had brought with him from PPC his laboratory notebooks relating to the studies of the "acidified" tampon, but had left the other notebooks in the PPC laboratories.

JJP argues here, as it did below, (1) that it and PPC are separate and distinct corporate entities; (2) that JJP had no control over the records of

---

[39] The normal "cut-off date" for discovery was waived by both sides.

[40] According to the trial record, West's counsel said: "I would like to make a request at this time that the research notebooks referred to by Dr. Hamilton be provided to the plaintiff, if in existence, as available in regards to testing of o.b. tampons by Johnson & Johnson Products, Inc., and/or Personal Products Company at some time prior to the date of trial, initial date of trial." JJP's counsel responded: "First of all, let me state that I have no idea whatsoever whether these research notebooks from defendant Johnson & Johnson Products still exist. I will inquire, assuming arguendo that they do exist. I have no idea how many they are, where they are, what is involved in accumulating them and getting them together. We are here on November 18th, eleven days shy of a trial of a case that is at least a couple of years ago, and I cannot represent, and I will not represent that it is even humanly possible to get this information and accumulate these notebooks if they exist, prior to trial. That is as far as JJP. [¶] As far as PPC is concerned, I would make the same statements, but would add that PPC is not a defendant in this case, and I do not even know if we can get those, if we have access to them. I do not agree to produce anything from PPC."

PPC; (3) that JJP had no obligation to produce PPC's records; and (4) therefore, JJP did not willfully suppress any evidence. We disagree.

Under Code of Civil Procedure section 2031, subdivision (a), a party served with a request for production and inspection of documents is obliged to identify and to allow inspection of those documents which are in the party's "possession, custody, or control." JJP knew well ahead of trial, and before discovery was completed, that Kraskin might be called to testify as an expert. Presumably, before naming Kraskin as a potential expert witness, JJP's counsel talked to him and learned of the existence of the research notebooks. JJP managed to persuade Kraskin—an employee of PPC, a sibling corporation—to travel from New Jersey to California to testify, and to bring some of the research notebooks with him. It is apparent that JJP thus exercised some "control" over the notebooks.

 Furthermore, a party served with interrogatories is required to make a reasonable investigation to ascertain facts when it has available to it sources of information pertaining to the matters involved in the interrogatories. (*Jones* v. *Superior Court* (1981) 119 Cal.App.3d 534, 552 [174 Cal.Rptr. 148].) Kraskin testified that in the mid-1970s he had "several meetings" with a scientist at JJP, and discussed with him "all the microbiology that we had determined . . . ."[41] Even if those meetings had been forgotten by 1982, JJP nevertheless was required to investigate in order to provide full and accurate answers to West's interrogatories. Such an investigation would have been neither burdensome nor unreasonable, because Kraskin testified that "[i]n the family of Johnson & Johnson companies, we have a lot of discourse, a lot of technical interaction."

In light of the concatenation of circumstances, we conclude that the instruction on willful suppression of evidence was correctly given. The instruction itself left to the jury the question of whether JJP had in fact intentionally suppressed material evidence.[42]

### X. WEST'S CROSS-APPEAL

 The trial court's order granting a conditional new trial was "granted on one ground only, to wit: excessive compensatory damages and excessive punitive damages." With respect to compensatory damages, the court noted that West had presented no evidence of any special damages or any

---

[41]See footnote 9, *ante.*

[42]In West's brief her counsel contends that the instruction was appropriate for an additional reason, viz., JJP's failure to call a particular witness to testify. We disagree. As far as we can tell from the record, West's counsel could have deposed the witness on commission prior to trial.

wage loss, that she had fully recovered from her illness, and that "[a]ny residual damages that plaintiff may sustain in the future as a result of her illness are speculative." Accordingly the court felt that "[t]he sum of $100,000 . . . is at the top of the range of fair and reasonable compensatory damages which could have been awarded in this case." With respect to punitive damages, the court found that "under the definition of malice set forth in BAJI #14.71, to wit: conduct carried on by defendant with conscious disregard for the rights and safety of others, substantial evidence against defendant was presented at trial by plaintiff primarily through the testimony of Dr. Tierno and Dr. Hann." But the court noted that JJP had sold 70 million units of o.b. tampons over a period of seven years, and that "[t]he number of complaints received by the defendant was comparatively small." The court also noted that punitive damages must bear a reasonable relationship to West's actual damages. Accordingly the court concluded that "$1,000,000 is a totally adequate deterrent in this case," and that "[i]n weighing all the evidence presented at trial, the conduct of defendant, though reprehensible, is not the type of conduct which warrants punishment in any amount over $1,000,000." The court found that both of the excessive awards were the result of the jury's "passion and prejudice."

On cross-appeal West contends that the court erred because its "reasons lack substantial support in the evidence." As to compensatory damages, West argues that there was evidence which showed (1) that she had *not* fully recovered from her illness, and (2) that she had residual fears of contracting TSS again in the future. As to punitive damages, West argues that JJP "is a very large and wealthy corporation," and that the reduced amount of $1 million "amounts to but .7 percent of [the] gross sales figure for that one product."

At trial one of the Kaiser physicians testified that when he saw her on June 30, 1980, West had no residual damage as the result of her illness. West herself testified that she stopped using tampons altogether in August of 1980. She further testified that her menstrual period was "altered" by her illness, and that because of that fact, she became emotionally upset during menstruation, and "my hands get really dry and they kind of—they kind of peel around the sides and stuff." Then she said: "But over a period of time, that's been getting less and less. It's kind of going away, but it's still there, just noticeably enough that I will look at it and remember." She did not testify that she had a fear of contracting TSS again. She said she "didn't know" if anything inside her body had been damaged permanently by her illness.

One of West's expert witnesses testified that TSS produced "long-term neurological and physiological effects," such as brain damage, in some pa-

tients. But he also testified that the medical profession does not know what the long-range effects of TSS will be.

The principles applicable to a motion for new trial on the ground of excessive damages are well summarized in *Grimshaw* v. *Ford Motor Co.*, *supra,* 119 Cal.App.3d at page 823. ■ We quote from that opinion: "In ruling on a motion for new trial for excessive damages, the trial court does not sit 'in an appellate capacity but as an independent trier of fact.' [Citation.] This role of fact finder is conferred on the trial court by Code of Civil Procedure section 662.5 which provides that if a new trial limited to the issue of damages would be proper after a jury trial, 'the trial court may in its discretion: . . . (b) If the ground for granting a new trial is excessive damages, make its order granting the new trial subject to the condition that the motion for a new trial is denied if the party in whose favor the verdict has been rendered consents to a reduction of so much thereof as the court *in its independent judgment determines from the evidence to be fair and reasonable.*' (Italics supplied.) In addition, Code of Civil Procedure section 657 provides that an order granting a new trial for excessive damages shall be reversed 'only if there is no substantial basis in the record for' the reasons stated in the judge's specification of reasons. An appellate court may reverse the order granting the new trial only when the reasons given by the trial judge reflect a manifest and unmistakable abuse of discretion. [Citations.]"

■ We find no such abuse of discretion in this case. It is apparent from the order that the trial court (1) listed the factors it considered; (2) weighed those factors; and (3) exercised its independent judgment in deciding what was "fair and reasonable" in terms of both compensatory and punitive damages. In the light of the evidence we have reviewed above, we cannot say that "there is no substantial basis in the record" for the reasons given in the order. We therefore decline to modify the judgment.

■ We also reject JJP's assertion that the "passion and prejudice" of the jury, noted by the trial court, necessarily "infected" the jury's determination of liability. Even if the excessive damage awards were the products of passion and prejudice, it does not necessarily follow that the verdict as to liability was similarly influenced. (*Sharp* v. *Automobile Club of So. Cal.* (1964) 225 Cal.App.2d 648, 652-653 [37 Cal.Rptr. 585]; *Turner* v. *Whittel* (1934) 2 Cal.App.2d 585, 589-590 [38 P.2d 835].) In this case the trial court's order conditionally granting a new trial was plainly limited to the issue of excessive damages, and the court's use of the word "reprehensible" in reference to JJP's conduct indicates that it found substantial evidence to support the verdict as to liability. A presumption of correctness

attaches to an order which conditionally grants a new trial. (*Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d at p. 822.)

"[W]here the trial court has required a remission as a condition to denying a new trial 'a verdict is reviewed on appeal as if it had been returned in the first instance by the jury in the reduced amount.' [Citations.]" (*Hughes* v. *Hearst Publications, Inc.* (1947) 79 Cal.App.2d 703, 705 [180 P.2d 419].) In parts I through IV of this opinion, *ante,* we have reviewed at length the evidence relating to JJP's liability. As we have noted, there was substantial evidence from which the jury could have concluded that JJP was strictly liable on the basis of defective design. The jury deliberated approximately four days before arriving at a verdict. At their request, the jurors were provided with copies of transcripts, which had been prepared daily throughout the trial, of the testimony of all of the expert witnesses. In the course of their deliberations, the jurors requested that they be given "the net worth of Johnson & Johnson Products, Inc." The trial court sent them a note saying, "No further evidence can be presented at this time."

We think it unlikely that the jury's verdict as to liability was influenced by passion or prejudice. As we have noted *ante* in part IX B of this opinion, the jury had before it evidence of the enormous wealth of JJP's *parent* corporation. The jury could well have deliberated solemnly and fairly on the issue of liability, and then have gone "overboard" on the issue of damages. Evidently this was the conclusion of the trial court. Our own review of the record supports that conclusion.

### XI. DISPOSITION

The judgment and the order are both affirmed.

Costs on appeal awarded to plaintiff.

Panelli, P. J., and Agliano, J., concurred.

A petition for a rehearing was denied December 16, 1985, and the petition of defendant and appellant for review by the Supreme Court was denied March 13, 1986. Panelli, J., did not participate therein. Lucas, J., was of the opinion that the petition should be granted.