[No. G003793. Fourth Dist., Div. Three. June 16, 1988.]

CYNTHIA CHRISTINE GENRICH, Plaintiff and Respondent, v. THE STATE OF CALIFORNIA, Defendant and Appellant.

**COUNSEL**

Joseph A. Montoya, Anthony J. Ruffolo, Irwin Schulman, Robert W. Vidor, Larry R. Danielson and Steve Larkin for Defendant and Appellant.

Horton, Barbaro & Reilly, Frank P. Barbaro and Charlotte E. Costan for Plaintiff and Respondent.

**OPINION**

**SONENSHINE, J.**—The State of California (State) challenges a jury verdict rendered against it in an action brought by Cynthia Genrich for personal injuries suffered in a traffic accident. It contends the trial court committed prejudicial error in permitting testimony regarding prior and subsequent accidents in the vicinity of the accident site without a showing those accidents occurred under similar conditions. It also asserts testimony concerning incidents unrelated to the alleged dangerous condition of the highway should have been excluded. We disagree and affirm.

I.

The accident occurred on an afternoon in July of 1980, at the intersection of Pacific Coast Highway and West Street in South Laguna Beach. Genrich, en route to the beach with a friend, was crossing Coast Highway in a marked pedestrian crosswalk located north of the intersection when she was struck by a pickup truck. The driver, Robert Davey, did not see her as she stepped into his truck's path; his view was obstructed by a large truck situated in a left turn lane intended for vehicles turning left onto West Street. Davey mistakenly believed the driver of the other truck was waiting for northbound traffic to clear, not pedestrians, before completing his left turn.

Genrich was severely and permanently injured as a result of the accident and sued Davey and the State, among others.[1] Her complaint against the

_____

[1] The original complaint named Davey only. The first amended complaint added the State of California, the County of Orange, and the City of Laguna Beach.

State alleged the system of traffic control in conjunction with the pedestrian crosswalk at the Coast Highway/West Street intersection constituted an unsafe and extremely hazardous condition upon public property.

At trial, Genrich called as an expert witness Harry J. Krueper, a consulting engineer in the field of traffic engineering and highway safety. Krueper had been retained to evaluate the roadway and intersection where the accident occurred and to consult with Genrich's counsel as to accident causation factors. He visited the site on several occasions to assess the roadway's physical layout, its speed, the sidewalks, the usage of the area, and other operational conditions. He also examined the traffic collision report and reviewed letters sent to the Department of Transportation (Caltrans) from residents in the area concerned with the intersection's safety.

In Krueper's expert opinion, there was no question the intersection, even when used with due care, constituted a dangerous condition on public property. He further believed the dangerous condition was the proximate cause of Genrich's injuries, and the injuries were a reasonably foreseeable consequence of the condition. Finally, he was convinced the State had knowledge of the particular problem, based on the following factors: "Their making annual traffic counts along the highway—maybe not specifically at this location, but in knowing the seasonal traffic and the volume of traffic on this roadway; the general character of the traffic in this area as being recreational during certain parts of the years; the knowledge that you had a beach access very close to this location where pedestrians would seek that location; the further knowledge that complaints had been registered with the State by a group of citizens, but to my knowledge there was nothing effectively done as a result of that; and prior accidents too. But I don't have the reports." He added "the State would have knowledge of this just by their own studies, absent any complaints by the citizens."

In formulating his opinion, Krueper relied in part on the Statewide Integrated Traffic Survey (SWITRS), a computerized accident data retrieval system which stores data pertaining to accidents occurring on state highways. Over the State's objection,[2] he testified his review of the SWITRS accident history for the period 1975 through 1985 disclosed 244 accidents had occurred within 1,500 feet in either direction of the subject intersection. He had not, however, had an opportunity to review the individual reports

A second amended complaint added as defendants UCI Medical Center and the Regents of the University of California. We are informed Genrich reached a settlement with those entities.

[2] When Genrich's lawyer asked Krueper, "Did [the report] show that there were approximately 200 . . . ," counsel for the State exclaimed: "I will object, unless they are similar accidents, pedestrian accidents." The objection was overruled; however, the court sustained the State's objection, on hearsay grounds, to admitting the report itself into evidence.

for those 244 accidents; he was shown the SWITRS data for the first time just before his court appearance.

Testifying on the State's behalf was Tsu Neo Toe Inuzuka, a registered traffic engineer employed by Caltrans since 1951. As part of his investigation, Inuzuka had reviewed Caltrans files to determine the accident history for the intersection during the five years preceding the subject accident. He had also examined the department's correspondence file "to see if there were any complaints or there were any concerns at this particular location." In his opinion, the "highway is safe for pedestrians and drivers when used with due care." He based his opinion on the "very favorable accident history with only one pedestrian accident occurring there in the last five years prior to this [accident]; that the pedestrian crosswalk markings were in accordance with good traffic engineering practice; that is, 12-inch stripes, spaced, with ten feet apart; that there was more than adequate advance warning of this crosswalk with an advance warning sign that was put on the side of the road about 200 feet in front of this location; plus there were two advance pavement markings to also identify that there was a crosswalk ahead; and the fact that there was more than adequate stopping sight distance to that location."

During cross-examination, Inuzuka handed Genrich's lawyer a letter sent to Caltrans in August of 1978 by the chairman of the South Laguna Civic Association. According to the letter, traffic and pedestrian safety problems on Pacific Coast Highway had been identified, at a recent association meeting, as one of the five most important issues of concern to the community. Inuzuka said no one at Caltrans ever responded to that letter.

Inuzuka was also cross-examined with respect to the SWITRS data. He said he was familiar with the study, although he had not considered it in formulating his opinion.

Finally, the jury heard testimony of South Laguna Beach resident Styles Burke who, from his home, had an unobstructed view of the West Street intersection. During the five-month period preceding the accident, two or three times each day, Burke had experienced the odor of "burning rubber" and the sounds of "screeching brakes" and "near misses" coming from outside his house. He could "recall the sensation it created each time [he] would hear the screeching tires and then a period of suspense waiting to hear the crash. It was quite startling to [him], the frequency." Defense counsel objected, stating "unless it's related to the pedestrian. No foundation this isn't some parked car or something." The court did not rule on the State's objection.

Burke also testified he telephoned Caltrans in the spring of 1980 on behalf of the South Laguna Civic Association. As chairman of the traffic commit-

tee, he related the members' "concerns about the [subject] intersection, the density of the pedestrian use, the fact that cars were making U-turns at that intersection, making a double penetration of the crosswalk. And [he] described to [the Caltrans representative] the whole situation, the near misses, the burning rubber, the rear-end collisions, the fender-benders." Burke said he had asked the representative if the crosswalk could be moved from the present location on the north side of the intersection to the south side.[3] He explained that people waiting to make left turns onto West Street acted as a block to vehicular traffic seeing pedestrians there. Burke stated the Caltrans representative responded a study would have to be made but he doubted very much if the results would lead to a traffic signal because other intersections had greater priority.

The jury found the public property at the location of the accident was in a dangerous condition at the time Genrich was injured, the dangerous condition was a legal cause of Genrich's injury, the injury was reasonably foreseeable as a consequence of the dangerous condition, and the State had actual or constructive notice of the dangerous condition for a period of time prior to the accident sufficient to take measures to protect against the condition. Damages were calculated in the sum of $3,753,410, with fault apportioned at 80 percent to the State, 10 percent to Davey and 10 percent to Genrich. The State's motion for new trial was denied, and this appeal followed.

## II.

The primary focus of this appeal is Krueper's disclosure of "raw accident data" contained in the SWITRS report. The State contends the court erred in allowing the witness to "parade" before the jury "details" of 244 prior and subsequent accidents without showing those accidents occurred under similar conditions. It complains it was precluded from receiving a fair trial because the challenged testimony confused,[4] angered and inflamed the jurors. Further, it accuses Krueper of "cover[ing] this extreme prejudice to the State" by saying he had just received the reports and did not have time to review them, and urges "[t]his ruse must be recognized for what it is, an attempt to put the raw numbers in evidence."

■ As a general rule, "[w]here the circumstances are similar, and the happenings are not too remote ·in time, other accidents may be proved to show a defective or dangerous condition, knowledge or notice thereof, or to establish the cause of an accident. [Citations.]" (1 Witkin, Cal. Evidence (3d

[3] The record discloses the crosswalk was subsequently relocated from the north side to the south side of the intersection. The jury was not privy to this evidence of subsequent repairs.

[4] The State points out the jury asked during deliberations to see the SWITRS report but was informed the document had not been received in evidence. The State's contention the jury wanted "very badly" to see the report is unsupported by the record, however.

ed. 1986) Circumstantial Evidence, § 386, p. 360; see also *Gilbert* v. *Pessin Grocery Co.* (1955) 132 Cal.App.2d 212, 217 [282 P.2d 148].) "The evidence must relate to accidents which are *similar* and which occur under *substantially the same* circumstances. [Citations.]" (1 Witkin, *supra,* § 388, p. 361.) "[T]he requirement of similarity may vary in strictness according to the purpose for which the evidence is introduced. Thus, if offered to show a dangerous condition of a particular thing—such as a step—the other accident must be connected in some way with that thing; but if offered only to show knowledge or notice of a dangerous condition, an accident at the place—a broader area—may be shown." (*Id.,* at p. 362.)

■ Genrich maintains the trial court properly exercised its discretion in permitting Krueper to testify regarding the SWITRS report. She argues the challenged data proved the State had notice the area's traffic control system, as a whole, constituted a dangerous condition. She insists "the high number of accidents in a limited stretch of Pacific Coast Highway should have put the [State] on notice that its traffic control system in that location was somehow deficient."

The State acknowledges the "similar condition" requirement has been somewhat relaxed for purposes of proving notice. (See, e.g., *Brake* v. *Beech Aircraft Corp.* (1986) 184 Cal.App.3d 930, 938 [229 Cal.Rptr. 336]; *Hilts* v. *County of Solano* (1968) 265 Cal.App.2d 161, 169 [71 Cal.Rptr. 275].) But it urges evidence of prior accidents, to be admissible, must still be "similar enough to actually impart notice of some particular condition requiring correction." It contends they must have occurred either at the same intersection or under substantially the same circumstances. Here, only five of the SWITRS-reported accidents involved a pedestrian.[5] And of those five, none occurred in crosswalks and all occurred at different intersections. In short, it argues "[i]t is difficult, if not impossible to logically sustain the contention that accidents at different intersections under vastly different conditions could give notice of a condition that could result in the accident as occurred here."

The State's position is well taken. We are unimpressed with Genrich's argument disclosure of the 244 accidents was proper to show the State had notice of the hazardous condition.[6] Further, a portion of those accidents occurred between 1980 and 1985, *after* the subject accident; a subsequent accident, though admissible to show a condition was dangerous, is not

---

[5]The State points out Genrich had subpoenaed 60 accident reports selected from the SWITRS printout. But her *motion to compel production was granted only as to five* which involved pedestrians.

[6]Genrich asserts the court erred in refusing to admit the report in evidence. Relying on *Gilbert* v. *Pessin Grocery Co., supra,* 132 Cal.App.2d at p. 216, she contends a report's contents are not subject to the hearsay rule when offered to prove notice.

In light of our conclusion, we need not reach this issue.

relevant on the issue of knowledge or notice of a dangerous condition existing at the time of the injury. (*Simmons* v. *Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 365 [133 Cal.Rptr. 42].)

But our review is not limited to the question of whether the court properly admitted evidence of prior and subsequent accidents. Also to be considered is the extent to which an expert witness may describe data, otherwise inadmissible, relied on in formulating his or her opinion. Viewing the matter in this light, we find no error in permitting Krueper to identify the SWITRS report, and its contents, as a basis for his opinion.

"Evidence Code section 801, subdivision (b) permits an expert to rely upon inadmissible evidence if it is 'of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . .' [Citation.]" (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 133 [211 Cal.Rptr. 356, 695 P.2d 653].) And, pursuant to Evidence Code section 802, the expert may state the reasons for his or her opinion and the matter upon which it is based.

However, the witness "may not testify as to the details of such matters if they are otherwise inadmissible. [Citations.] The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence. [Citation.]" (*Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 788-789 [174 Cal.Rptr. 348].) This, the State contends, is precisely what occurred here.

A similar challenge was rejected in *West* v. *Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831 [220 Cal.Rptr. 437, 59 A.L.R.4th 1]. In *West,* the trial court allowed an expert to testify concerning consumer complaints directed to the defendant, although the complaints themselves were inadmissible hearsay. The witness was permitted to describe the nature of the complaints and even to read excerpts from pertinent ones. The jury was told at the outset the testimony was being admitted "solely on the issue of whether [the defendant] had received notice of defects in its product." (*Id.,* at p. 859.)

On appeal, the defendant argued the admission of the testimony was prejudicial error. It asserted the complaints could not have alerted the defendant to the hazard of toxic shock syndrome, which was unknown at the time, and "the verbatim reading of portions of the complaints was unduly inflammatory." (*Id.,* at pp. 859-860.) The appellate court concluded the trial judge committed no error in admitting that testimony. It noted the defendant had ample opportunity to point out the dissimilarities between the complainants' symptoms and those of toxic shock syndrome. Further-

more, the defendant "made no request for a limiting instruction, to the effect that matters on which an expert based his opinion were admitted only to show the basis of the opinion and not for the truth of the matter. [Citation.]" (*Id.,* at p. 861.)

▆▆▆ The State insists the hearsay in the form of raw accident data was indeed admitted for the truth of the matter asserted. And while it acknowledges "the use of a limiting instruction that matters on which an expert based his opinion are admitted only to show the basis of the opinion and not for the truth of the matter [ordinarily] cures any hearsay problem involved," it points out "in aggravated situations, where hearsay evidence is recited in detail, a limiting instruction may not remedy the problem. [Citations.]" (*Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d at p. 789.)

Here, of course, no such instruction was given. But none was requested. And the State overlooks the fact "[t]he court is not required to give such limiting instructions *sua sponte.* [Citations.]"[7] (*Ibid.*) Furthermore, we reject the State's implication a limiting instruction would, in any event, have been futile because this is an "aggravated situation." Krueper did not recite the challenged evidence "in detail." More importantly, the accident data was not, as the State maintains, the primary factor upon which Krueper relied in asserting the existence of a dangerous condition.

On cross-examination, Krueper was asked how he used the SWITRS report to indicate whether the pedestrian crosswalk at the West Street intersection was dangerous. He replied: "I didn't use it by itself. Merely the number of accidents within 1,500 feet on either side of this would indicate that there are situations on Pacific Coast Highway which are above normal which —but I cannot say that they're all pedestrians. I don't say they are all pedestrian accidents. There are many other type[s] of accidents, I'm sure." He also stated neither the presence nor absence of prior pedestrian accidents at the West Street intersection would influence his conclusion the intersection constituted a dangerous condition.

Defense counsel then asked Krueper: "Is that report of any use to you, the information contained therein, as to whether or not the particular leg of this intersection at West Street on Pacific Coast Highway was of danger to pedestrian use?" Krueper replied: "I'd have to study each of these accidents to respond to that. That would take hours." When asked if he had done that yet, Rrueper responded: "No, I have not. *That wasn't the principal basis of*

---

[7]Relying on *Mosesian* v. *Pennwalt Corp.* (1987) 191 Cal.App.3d 851 [236 Cal.Rptr. 778], Genrich asserts the State's failure to move to strike Krueper's reference to the SWITRS statistics after its objection was overruled constitutes a waiver. The State insists its objection was timely and proper. It also distinguishes *Mosesian* on the ground the jury there was instructed not to accept the hearsay opinions for the truth of the matter asserted; no comparable instruction was given here. However, as stated above, no such instruction was requested.

*my recommendation.*" (Italics added.) Counsel concluded: "So the answer is you have not utilized the report to indicate to you that that particular crosswalk was in a dangerous condition?" Krueper said: "Not by itself, no. The mere 244 accidents in this section had to influence any opinions, but I can't tell you how many pedestrian accidents there are."

Krueper acknowledged he would need the individual accident reports to evaluate the conditions under which the accidents occurred; however, that information was unavailable. Even the court, at one point during the testimony, interjected: "You didn't know the specifics of any of the accidents cited in the SWITRS, did you?" Krueper responded, "No."

As the foregoing demonstrates, the jurors were privy to the limitations placed upon Krueper's reliance on the data. They knew the witness had just seen the report for the first time. And they heard his testimony it was not the principal basis of his recommendation. Under these circumstances, we fail to see how they could have been misled.

## III.

The State contends the trial court further erred in permitting Genrich's counsel to use statistical information contained in the SWITRS report to impeach Inuzuka. Citing Evidence Code section 721, subdivision (b),[8] it complains Inuzuka did not rely on the report for his opinion; yet, he was confronted during cross-examination with the accident data contained therein.

But Inuzuka *did* testify during direct examination concerning previous accidents at the accident site. Thus, the contents of the SWITRS report was a proper subject for cross-examination. (See Evid. Code, § 761.) Moreover, Evidence Code section 721 is inapplicable in any event because the SWITRS report is not a text, treatise or journal, as those terms are used in the statute. Further, the State never objected to use of the report for impeachment purposes; it objected on relevancy grounds only. It is therefore precluded from raising the issue on appeal. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 307, p. 317.)

## IV.

Finally, we turn to the State's contention Burke's reference to "burning rubber," "fender benders," and "near misses" tended to "mislead,

---

[8] Evidence Code section 721, subdivision (b) provides as follows: "If a witness testifying as an expert testifies in the form of an opinion, he may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless: [¶] (1) The witness referred to, considered, or relied upon such publication in arriving at or forming his opinion; or [¶] (2) Such publication has been admitted in evidence."

confuse, excite, and anger the jury." It argues "[t]he highly detrimental effect of such verbiage without qualification constituted significant and unsurmountable prejudice to the State." And, with respect to Burke's account of "screeching tires" and the frequency of the occurrence, the State contends "[t]he problem is there was no showing the screechings or the frequency thereof had any bearing or impact on pedestrian traffic at the [subject] intersection . . . . Therefore, its only purpose would be to excite, anger, inflame and improperly persuade the jury through highly prejudicial and marginally probative evidence."

Genrich maintains the trial court properly permitted Burke to testify for the limited purpose of showing the State had notice of a dangerous condition. After all, she asserts, "it was these observations which led Mr. Burke to telephone Caltrans to notify that agency of the dangerous condition." We agree.

The State's reliance on *Wilkerson* v. *City of El Monte* (1936) 17 Cal.App.2d 615 [62 P.2d 790] is misplaced. More to the point is *Hilts* v. *County of Solano, supra,* 265 Cal.App.2d 161.

In *Hilts,* a witness testified there had been several accidents at a certain intersection. On cross-examination, he admitted he had not seen the accidents. He also stated he was unsure how many there were and acknowledged some of the drivers may have been intoxicated. The County challenged that evidence on appeal, relying on *Wilkerson* v. *City of El Monte, supra,* 17 Cal.App.2d at pages 620-621 (evidence of prior accidents is inadmissible to show the dangerous condition of an intersection unless there is evidence as to the cause of said prior accidents) and *Martindale* v. *City of Mountain View* (1962) 208 Cal.App.2d 109, 116 [25 Cal.Rptr. 148] (evidence of prior accidents is admissible to prove existence of a dangerous condition provided the accidents occurred under circumstances substantially similar to those of the accident for which recovery is sought).

The appellate court found the County had waived its objection by failing to move to strike the witness's testimony. But more importantly, the court held the challenged testimony provided notice to the County of a dangerous condition and was admissible for that purpose: "The requirement of similarity of conditions is 'much relaxed' when the evidence is offered to show *notice* of the dangerous condition. [Citation.] In order to establish the liability of County for a dangerous and defective condition of public property it was incumbent upon plaintiffs to show that County had actual or constructive notice of the alleged dangerous condition of the intersection. [Citation.] The test of admissibility of evidence of prior accidents *to show notice is that* the evidence must be such as to have attracted the defendant's attention to

the dangerous situation. [Citation.]" (*Hilts* v. *County of Solano, supra,* 265 Cal.App.2d at p. 169.)

Additionally, the jury here was given an appropriate limiting instruction with respect to Burke's testimony. The witness testified he told the Caltrans representative he wanted to discuss a problem concerning the intersection which he and his neighbors "considered to be extremely dangerous." Defense counsel objected and moved to strike. The court overruled the objection and, at that point, admonished the jury: "Among other questions, ladies and gentlemen, you will be asked to determine at the end of the case whether or not Caltrans knew or should have known of a dangerous condition at the intersection. If you find that the intersection was in fact a dangerous condition, given the instructions and evidence. [*Sic*.] This testimony [of Burke] is not being received except on the issue of notice, whether or not Caltrans knew or should have known of the conditions at the intersection. [¶] So it's not being received, and you are not to consider it as evidence that a dangerous condition in fact existed, but only as to whether or not Caltrans or the State knew or should have known of a problem if you determine one existed."

■ "The question of the admissibility of evidence of prior and subsequent accidents is primarily one for the trial court and is confined to its sound discretion. [Citation.]" (*Simmons* v. *Southern Pac. Transportation Co., supra,* 62 Cal.App.3d at p. 365.) ■ We find no abuse here.

Judgment affirmed. ■ ■ ■ ■ Respondent to receive costs.[9]

Scoville, P. J., and Wallin, J., concurred.

A petition for a rehearing was denied July 12, 1988, and appellant's petition for review by the Supreme Court was denied August 31, 1988.

---

[9] Genrich requests sanctions be imposed against the State for filing a frivolous appeal. Contending both prongs of the test enunciated in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179] have been met, she complains the appeal was prosecuted for an improper motive *and* is undisputably without merit.

While we disagree with the State's position, we cannot say the appeal is totally and completely devoid of merit. Nor do we subscribe to the notion the State's only purpose in appealing was to delay satisfaction of the judgment. Thus, sanctions are clearly inappropriate.