Filed 12/22/25  Palaioroutas v. The Regents of the U. of Cal. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| VASILEIOS PALAIOROUTAS, Plaintiff and Appellant, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Respondent. | B336745 (Los Angeles County Super. Ct. No. 21STCV05025) |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Lynne M. Hobbs, Judge.  Affirmed.

Benedon & Serlin, Kelly Riordan Horwitz and Melinda W. Ebelhar for Plaintiff and Appellant.

McCune & Harber, Stephen M. Harber and Amy A. Evenstad for Defendant and Respondent.

_____

On a rainy day in February 2019, Vasileios Palaioroutas slipped and fell on a stainless-steel grate outside the cafeteria at the University of California, Los Angeles (UCLA) Ronald Reagan Medical Center (the Medical Center). The grate was part of a drain designed to prevent water from pooling at the entrance of the building and, at the time of the incident, it was not broken or malfunctioning. There was no evidence that anyone else had slipped on the grate in the one decade plus since the renovated Medical Center opened to the public in 2008.

Palaioroutas sued the Regents of the University of California (the Regents) for premises liability based on a dangerous condition within the meaning of Government Code[1] section 835. He claimed the Regents created a dangerous condition because the grate was too slippery when wet and they failed to warn of or correct this danger. The Regents moved for summary judgment, arguing that design immunity under section 830.6 barred Palaioroutas's claim, and that in any event, Palaioroutas could not establish the elements of a dangerous condition claim. The trial court found the design immunity defense applied and entered judgment in the Regents' favor.

On appeal, Palaioroutas does not dispute that design immunity shields the Regents from liability for creating a dangerous condition. He argues, however, that design immunity does not categorically bar his claim for the Regents' alleged failure to warn of or to correct the dangerous condition. He also contends triable issues exist as to the elements of his failure to

---

[1] Unspecified statutory references are to the Government Code.

warn or correct claim, including whether the Regents had actual or constructive notice of the dangerous condition.

Palaioroutas adduced no evidence that the Regents had actual or constructive notice of the dangerous condition. It is therefore undisputed they did not. Because this is dispositive of the failure to warn/correct claim, we do not consider whether design immunity categorically bars Palaioroutas's failure to warn/correct claim. We thus affirm.

## BACKGROUND

### A. General Legal Principles Relating to Premises Liability for a Public Entity

We first provide an overview of public entity premises liability law to place our factual summary in context.

A public entity is not liable for any injury except as provided by statute. (§ 815.) Section 835 makes a public entity "liable for injury caused by a dangerous condition of its property" when "(a) . . . the public entity . . . created the dangerous condition; or [¶] (b) [t]he public entity had actual or constructive notice of the dangerous condition under [s]ection 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."[2] (*Id*., subds. (a), (b).)

" 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property . . . is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830, subd. (a).)

---

[2] " 'Protect against' includes . . . correcting a dangerous condition, providing safeguards against [it], or warning of [it]." (§ 830, subd. (b).)

3

Under section 835.2, a public entity has actual notice of a dangerous condition "if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." (*Id*., subd. (a).) The public entity will be deemed to have had constructive notice "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." (*Id*., subd. (b).)

Section 830.6 creates the affirmative defense of design immunity, which bars a public entity's liability "for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance." To establish the defense, a public entity must show: "(1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 69.)

## B.    The Complaint

On February 8, 2021, Palaioroutas sued the Regents using a Judicial Council personal injury form complaint. He alleged that he slipped and fell on a metal grate while entering the Medical Center cafeteria and was thereby injured. He asserted three counts of premises liability: (1) negligence, (2) willful failure to warn pursuant to Civil Code section 846, and (3) dangerous condition of public property. Under count 3, Palaioroutas alleged the Regents had actual notice of the dangerous condition in sufficient time to have corrected it. After the Regents filed their motion for summary judgment,

4

Palaioroutas filed a first amended complaint (FAC) to allege both actual and constructive notice in count 3.  The parties stipulated the Regents' motion, which had anticipated a constructive notice argument, would apply to the FAC.

## C.    The Evidence

### 1.    *Evidence About the Accident*

According to Palaioroutas, on February 15, 2019, he accompanied his cousin to an appointment at the Medical Center. After approximately half an hour, Palaioroutas decided to get a coffee at the cafeteria.  It had been raining "all day."  He walked outdoors in the rain without an umbrella for approximately two minutes towards the cafeteria, which was located in a different part of the Medical Center.  The ground was wet due to the rain, and he also got "[a] little bit" wet.  He saw a metal drain and grate that spanned the cafeteria entrance from about four feet away.  When he stepped on the grate, he slipped and fell.  He did not remember how many steps he took before he slipped.  The Regents had not placed any warning signs in front of the grate, or a waterproof mat or other cover on the grate.

Palaioroutas testified there were no puddles of water on the drain.  Rather, there were holes in the drain, and "[t]he water did not make a puddle" because "[i]t was going down."  He confirmed the grate was wet but there was no standing water.  Photographs Palaioroutas took after the incident do not show water pooling on the drain or the presence of debris.  They also show a mat placed immediately inside the doors to the cafeteria.  In a later declaration, Palaioroutas claimed, "The cafeteria entrance, including the . . . [m]etal [g]rate, was saturated with water at the time."

5

When deposed, Palaioroutas testified he did not report the fall to anyone at the cafeteria or to anyone at UCLA that day. He sat at a table for four to five minutes before going to order coffee. In a declaration submitted in opposition to the Regents' summary judgment motion, however, Palaioroutas claimed that he reported the accident to a cafeteria manager. Palaioroutas also told his cousin, who told Palaioroutas to take pictures of where he fell, which he did.[3]

Palaioroutas walked to the emergency room, but it was busy, and he left. He returned early the next morning and had X-rays taken. He sustained injuries to his left wrist, right and left shoulders, neck, and lower back. He has been unable to work since the accident.

At his deposition, Palaioroutas admitted he had no knowledge that anyone else had slipped on the metal grate. In their separate statement, the Regents stated that Palaioroutas had "no evidence of any prior similar incidents." Palaioroutas did not dispute this fact.

2.     *Evidence About the Drain and Grate*

Architect and senior project manager with the UCLA Health–Planning, Design and Construction department, Thomas Born, oversees, manages, and provides design support for projects at UCLA Health. His responsibilities include the Medical

---

[3] According to Palaioroutas, 30 minutes after he fell the Regents placed a yellow cone in front of the grate. However,"[t]he fact that action was taken after an injury occurred to protect against a condition of public property is not evidence that the public property was in a dangerous condition at the time of the injury." (§ 830.5, subd. (b).)

6

Center, which opened to the public in 2008. He declared that the design plans for the cafeteria "specify the presence of the metal drain and floor grate involved in [Palaioroutas's] alleged incident . . . . This metal drain and floor grate was installed outside the cafeteria for drainage purposes, such as to collect rainwater on a rainy day. It was designed and constructed with steel grates spaced 1/8 inch apart to provide an anti-slip surface sufficient for collecting rainwater while providing an accessible pathway to the cafeteria." Born opined, "[T]he design of the metal drain and floor grate is a standard, reasonable design often used for such purposes in the industry."

Born further declared that prior to construction, the design plans had been approved by the California Office of Statewide Health Planning & Development, Facilities Development Division (OSHPD).[4] OSHPD later issued an approval of the construction of the incident area, which meant that the area was built as designed. Born opined that the drain was built as designed and remained in conformity with the design plans on the date of the incident.

Palaioroutas's expert, Brad Avrit, is a licensed civil engineer and safety inspector who is certified in measuring the slip-resistance of walking surfaces. Avrit disagreed with Born's opinion that the design plans sufficiently addressed the grate's design and, thus, that the grate's design had been approved. He also disagreed that the spacing of the metal offered slip resistance or that the grate's design was reasonable. Avrit

_____

[4] According to Born, "OSHPD is a state agency that monitors the construction of healthcare facilities and all attendant buildings that comprise a healthcare facility."

7

opined that because the metal grate was made from stainless steel and had a smooth surface or finish, it was not slip resistant. Avrit's colleague measured the slip-resistance of the steel grate using a tribometer (an instrument that can measure friction) while the grate was wet and determined it was "as low as 0.38." Avrit observed this was below what he claimed was standard, and that a floor with a slip resistance of 0.5 or above is generally sufficiently slip-resistant. The grate was therefore slippery and created an unsafe condition and safety hazard on the date of the incident, which caused Palaioroutas to fall and sustain injuries. Avrit further opined that for $200 or less, the Regents could obtain a safety mat to place over the drain or alter the surface characteristics of the grate.

3. *Deposition of the Medical Center's Operations Manager*

Gerardo Gutierrez is the operations manager for environmental services, which is responsible for maintaining a clean and safe environment for the outdoor portions of the Medical Center. At the time of Gutierrez's deposition, he had been the operations manager for approximately 15 years. Two hundred employees reported to him, including 13 supervisors. Gutierrez testified that an employee is assigned to the cafeteria lobby and outdoor dining area; that employee maintains and cleans the grates as needed. (The nutrition department cleans and maintains the other interior portions of the cafeteria.) Although the employee does not keep a log of his inspections, the employee that is regularly assigned to that area and who was responsible for the area at the time of the incident has worked at UCLA for over 30 years, and his tasks are overseen by a supervisor. If that employee saw debris on the grate, he would

8

have cleaned it.  Also, if any employee sees a potential defect or issue on the property, they are to report it to their supervisors.

On rainy days, environmental services places umbrella bags at all the main entrances.  Mats that are inside the entrances are always there.  Similarly, blue plastic or rubber mats outside other entrances are "always there," even when it is not raining.  Gutierrez did not know whether the mats "[did] anything for water."  He thought the mats were used to clean little pebbles off the shoes of people entering the various buildings to protect against scratching the terrazzo floors.  The Medical Center does not put down mats before the cafeteria entrance because a mat placed outside is "going to defeat the purpose.  It will get wet."[5]

Gutierrez acknowledged environmental services employees did not take any other additional safety measures for the exterior areas when rain is suspected.  He explained, "There's never any water built up or anything there.  The only precautions we take is the umbrella bag, and we might put a wet floor sign at the entrance to be careful, but that's it."  He did not know if anyone in his department investigated how slippery the grate gets when it is wet.  Gutierrez was not aware of any of his employees ever

---

[5] The Regents represent that the other entrances where blue mats were placed outside are covered entrances.  Gutierrez did not testify explicitly to this fact, but he was shown photographs of the other entrances; at least one of those photographs (exhibit 5 in Gutierrez's deposition) is the entrance to Stewart and Lynda Resnick Neuropsychiatric Hospital.  The rain pattern on the floor outside that entrance suggests the entryway is covered, and Palaioroutas does not dispute that these entrances were covered.

9

placing yellow cones that warn of slipping risks outside. They do not place yellow cones outside as a matter of practice. Rather, they use such cones inside when they are mopping the floor or cleaning up a spill.

Gutierrez also testified there had been no prior instance where employees working under him had advised him that someone had slipped in the area where Palaioroutas had fallen. Gutierrez further stated if someone had so advised him, he would have gotten a report or something similar about the incident, and he has never received any such report. Gutierrez was not aware of anyone falling on grates at other Medical Center entrances.

## D. The Motion for Summary Judgment

### 1. *The Regents' Motion*

In December 2022, the Regents filed a motion for summary judgment or, in the alternative, summary adjudication. They argued that Palaioroutas's claim for common law negligence (count 1) could not be maintained against a public entity. They also argued count 2 for failure to warn pursuant to Civil Code section 846 failed as a matter of law because that section concerned a property owner's duty of care to keep their premises safe for use for "recreational purposes," such as fishing or hunting, and Palaioroutas was not engaged in any such activity. (§ 846, subd. (b).) The trial court granted the Regents' summary adjudication on these two counts, and Palaioroutas does not argue the court erred in doing so.[6]

---

[6] The Regents appear to suggest that Palaioroutas's only failure to warn claim was asserted under Civil Code section 846, and that he did not allege a section 835, subdivision (b) failure to

10

The Regents argued that design immunity barred Palaioroutas's remaining claim (count 3) for dangerous condition. The Regents further argued that in the event design immunity was not a total defense, the metal grate that allegedly caused Palaioroutas's fall was not in a dangerous condition, the Regents did not have notice of a dangerous condition, and Palaioroutas could not establish proximate cause. As to the issue of notice, the Regents observed there were no prior incidents of persons slipping on grates and that the evidence established that, on the day of the incident, the metal drain was working as intended. The Regents further claimed Palaioroutas could not adduce evidence to show, as required under section 835, subdivision (b), that the alleged dangerous condition existed for such a period of time and was of such an obvious nature that the Regents, in the exercise of due care, should have discovered the condition and its dangerous character.

2. *Palaioroutas's Opposition*

As Palaioroutas no longer disputes that the design immunity defense applies to the Regents' alleged creation of a dangerous condition, we do not summarize the arguments he made before the trial court concerning it.

Palaioroutas argued that under *Cameron v. State of California* (1972) 7 Cal.3d 318 and *Flournoy v. State of California* (1969) 275 Cal.App.2d 806, design immunity did not categorially bar section 835, subdivision (b) dangerous condition claims. Thus, irrespective of design immunity, "[l]iability arose because

_____

warn claim. Any such suggestion is incorrect. Count 3 for dangerous condition includes a failure to warn claim under section 835, subdivision (b).

11

[the Regents] failed to take necessary precautions to mitigate the risk of a slip and fall accident when the [subject grate] was slippery." He claimed the Regents could have mitigated the dangerous condition by warning the public and placing slip-resistant mats on or before the grates.

Palaioroutas also argued that there were triable issues as to whether the grate was a dangerous condition, including whether the Regents had notice of the danger. He argued, as he does on appeal, that prior similar incidents are not necessary to establish notice.

3.      *The Regents' Reply*

In reply, the Regents argued that *Cameron* and *Flournay* were inapplicable as they "look[ed] at other immunities in the Government Code regarding roadways, which are not applicable here."[7]

4.      *The Trial Court's Ruling and Judgment*

After hearing argument, the court issued a written order granting summary judgment on the basis of design immunity. The court explained that the Regents had established each of the elements of the defense and that Palaioroutas failed to demonstrate a triable issue. In considering whether Palaioroutas demonstrated a triable issue of whether the design caused his injuries, the court found the undisputed evidence showed that the grate was not in a dangerous condition due to the Regents'

_____

[7] The Regents submitted 48 evidentiary objections. The court sustained a single objection to a version of Palaioroutas's photographs that included timestamps, which Palaioroutas had not produced during discovery. The court overruled the remaining objections.

12

neglect.  Specifically, the evidence established the blue mats were not used to prevent slip and fall incidents that would occur as a result of water.  Further the grate was cleaned and maintained regularly.

**E.     The New Trial Motion**

Palaioroutas moved for a new trial on the grounds that the trial court failed to correctly apply *Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, *Cameron v. State of California*, *supra*, 7 Cal.3d 318, and *Flournoy v. State of California*, *supra*, 275 Cal.App.2d 806.  In response, the Regents argued these cases concerned the narrow issue of failure to warn of a concealed trap on a roadway, and, therefore, there was no error of law warranting a new trial.  Following argument, the court denied the motion.

### DISCUSSION

**A.     Summary Judgment Framework and Standard of Review**

In moving for summary judgment, "[a] defendant . . . has met [its] burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action.  Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto. . . ."  (Code Civ. Proc., § 437c, subd. (p)(2).)  A triable issue of material fact exists " ' "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." ' "  (*Janney v.*

13

*CSAA Ins. Exchange* (2021) 70 Cal.App.5th 374, 389-390.)
" 'Speculation . . . is not evidence' that can be utilized in opposing a motion for summary judgment." (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 99.)

"We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) " 'We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206.)

"We . . . are not bound by the reasons in [the trial court's] summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Joshi v. Fitness Internat., LLC* (2022) 80 Cal.App.5th 814, 824.) "Thus, a reviewing court 'will affirm a summary judgment if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons.' " (*Nicoletti v. Kest* (2023) 97 Cal.App.5th 140, 144.)

## B. Palaioroutas Has Not Demonstrated a Triable Issue Exists as to the Regents' Lack of Notice of the Dangerous Condition

Palaioroutas asserts his concession that the design immunity defense applies here does not end his case. He argues that in *Tansavatdi v. City of Rancho Palos Verdes*, *supra*, 14 Cal.5th 639, a case involving a concealed trap roadway accident, our Supreme Court reaffirmed that design immunity does not categorically bar failure to warn claims made pursuant to section

14

835, subdivision (b).  (*Tansavatdi*, *supra*, at p. 647.)  The Regents argue *Tansavatdi* is inapplicable, pointing to the Supreme Court's statement therein that it "express[ed] no opinion regarding . . . how design immunity might affect failure to warn claims that do not involve a traffic condition."  (*Id.* at p. 654, fn. 3.)

We need not address the question that *Tansavatdi* left open.  Even if the design immunity defense did not affect Palaioroutas's section 835, subdivision (b) failure to warn claim, he would have to show that a question of material fact existed regarding that failure to warn claim.  As we explain below, he has not done so as to the element of notice, that is that the Regents knew or should have known of the dangerous condition.  Because this issue is dispositive, we need not consider Palaioroutas's other arguments.  (*Nicoletti v. Kest*, *supra*, 97 Cal.App.5th at p. 144.)

As stated above, section 835, subdivision (b) makes a public entity "liable for injury caused by a dangerous condition of its property" when "[t]he public entity had actual or constructive notice of the dangerous condition under [s]ection 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."  (*Ibid.*)  Here, the Regents set forth evidence demonstrating that they did not have notice of the alleged dangerous condition, and Palaioroutas adduced no competent contrary evidence creating a disputed issue of fact.

1.    *Actual Notice*

A public entity has actual notice "if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character."  (§ 835.2, subd. (a).)  A public entity's

15

employees' general knowledge regarding the condition is insufficient to establish actual notice. (*State of California v. Superior Court* (1968) 263 Cal.App.2d 396, 399.) There must be evidence that employees had knowledge of the particular dangerous condition in question. (*Ibid.*)[8]

"As a general rule, '. . . other accidents may be proved to show . . . notice [of a dangerous condition]. [Citations.]' [Citations.] 'The evidence must relate to accidents which are similar and which occur under substantially the same circumstances'" and which are not too remote in time. (*Genrich v. State of California* (1988) 202 Cal.App.3d 221, 227-228, italics omitted.) A court may also consider the other side of the coin— the absence of prior incidents or accidents—in evaluating notice to the public entity. (*Lupash v. City of Seal Beach* (1999) 75 Cal.App.4th 1428, 1435.) Thus, *Martinez v. City of Beverly Hills* (2021) 71 Cal.App.5th 508 held that the public entity defendant carried its initial burden on summary judgment to show that it lacked actual notice by submitting evidence that it had not received any complaints or reports about prior similar incidents. (*Id.* at p. 521.)

---

[8] For example, in *State of California v. Superior Court*, *supra*, 263 Cal.App.2d 396, actual notice was lacking when state employees knew that beachgoers sometimes left hot coals on public beach firepits and that the coals could stay hot for days, but the employees did not know of the presence of the hot coals on the date of the plaintiff's injury. (*Id.* at pp. 399-400.) Similarly, in *Maksimow v. City of South Lake Tahoe* (2024) 106 Cal.App.5th 514, although city employees had general knowledge that snow sometimes turns to ice, nothing in the record suggested they had actual notice of the particular ice patch that caused the accident. (*Id.* at p. 524.)

Palaioroutas disputes the propriety of using the absence of prior accidents as evidence that the Regents lacked notice. He cites *Beauchamp v. Los Gatos Golf Course* (1969) 273 Cal.App.2d 20 for the general proposition that "[t]he absence of other accidents is not proof per se that no dangerous condition existed." Here, however, we are not concerned with the existence of a dangerous condition, but with the Regents' *notice* of such a condition. On the issue of notice, *Beauchamp* states the same as the other cases we have already cited: " 'The operation of an instrumentality for a reasonable period of time under similar circumstances may have a tendency to show that in the ordinary course of things, an accident not having previously occurred, there is no reason to anticipate one.' " (*Id*. at p. 36.)

Gutierrez, who for over 15 years (since the renovated Medical Center opened to the public in 2008) was the manager responsible for employees who maintained a safe and clean outdoor environment at the Medical Center, had not heard of any incidents of falls on the metal grates at the cafeteria or anywhere at the Medical Center. Further, given his position, if any such falls had occurred, they would have been reported to him. The Regents thus carried their initial burden to show they lacked actual notice of the alleged dangerous condition.

Palaioroutas did not dispute Gutierrez's testimony or offer any evidence to rebut it. Rather, Palaioroutas attempts to diminish that testimony by claiming the lack of other accidents could be attributable to the use of mats at other Medical Center entrances. This claim is speculative and, thus, insufficient to create a triable issue. (*Knapp v. Doherty*, *supra*, 123 Cal.App.4th at p. 99.) Moreover, it ignores entirely the critical fact that there were also no prior accidents at the cafeteria, which did not have a

17

mat placed before the grate.  Palaioroutas thus fails to demonstrate a triable issue that the Regents had actual notice of the alleged dangerous condition.

2.    *Constructive Notice*

A public entity has constructive notice of a dangerous condition "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." (§ 835.2, subd. (b).)  "[W]hen the defect lacks sufficient conspicuity to impute notice, courts may determine the defect is not obvious as a matter of law."  (Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 2025) § 12.47(A)(i), citing *Martinez v. City of Beverly Hills*, *supra*, 71 Cal.App.5th at p. 524 and *Heskel v. City of San Diego* (2014) 227 Cal.App.4th 313, 319.)

The record evidence here does not establish a triable issue of fact regarding imputed notice.  There were no prior accidents that would have given rise to the Regents' awareness of the alleged defect or a need to investigate the slipperiness of the grate.  (*Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 243 [discussing the absence of prior incidents in notice discussion concerning both actual and constructive notice].)  Further, there is no evidence that drain/grate had broken or malfunctioned or that standing water or debris was present on the grate.[9]  Rather,

_____

[9] To the extent Palaioroutas intended the statement in his post-deposition declaration that the grate was "saturated" to mean that there was standing water or a puddle, we disregard this statement such as contradicting his earlier deposition

18

the photographs in the record depict the grate as clean, and the Regents presented evidence that the tasks of the employee long-assigned to the outdoor area of the cafeteria included cleaning the grates as needed. Indeed, the only evidence Palaioroutas presented to demonstrate that the grate was in a dangerous condition required a specialized scientific tool (a tribometer) to measure the friction coefficient of the grate when it was wet. Thus, the alleged defect in the metal grate lacked conspicuity.

Palaioroutas argues the dangerous condition was nevertheless obvious to the Regents. He states, "It [i]s a [m]atter of [c]ommon [k]nowledge [t]hat a [m]etal [s]urface [i]s [s]lippery [w]hen [w]et." (Boldface omitted.) From this truism he concludes that the slipperiness of the grate was obvious to the Regents, and that nothing more was needed to impart notice because it had been raining all morning and the employee assigned to maintain the outdoor area of the cafeteria had been at the Medical Center longer that day than Palaioroutas had been.

Government entities are not required to expend resources minimizing the slipperiness to pedestrians of all wet outdoor ground surfaces simply by virtue of noticing it is raining. Palaioroutas saw the metal grate and saw that it was wet before he stepped on it. He does not contend he needed notice of the grate; nor did he need notice of the rain of which he was plainly aware. As Palaioroutas acknowledges, it is within the common experience and knowledge of ordinary persons that ground surfaces become more slippery when it is wet. It follows then that a metal drain grate wet with rain will require those who

---

testimony. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21.)

19

walk on it to use due care appropriate to the situation. (§ 830, subd. (a); *Fredette v. City of Long Beach* (1986) 187 Cal.App.3d 122, 131 ["The manifest intent of the Tort Claims Act is to impose liability only when there is a substantial danger *which is not apparent* to those using the property in a reasonably foreseeable manner with due care" (italics added)]; cf. § 831 ["Neither a public entity nor a public employee is liable for an injury caused by the effect on the use of streets and highways of weather conditions as such. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such effect if it would not be reasonably apparent to, and would not be anticipated by, a person exercising due care"].) A warning to that effect was therefore unnecessary.

Alternatively, Palaioroutas argues that regardless of surfaces generally being more slippery when wet, the Regents had constructive notice requiring them to warn him because the particular grate at issue was "*unreasonably* slippery when wet." (Italics added.) This claim fares no better. There is no evidence in the record that the Regents knew or had reason to know the grate was slippery beyond what could be ordinarily expected. And without evidence to impute such knowledge to the Regents, there is no triable issue of constructive notice giving rise to a duty to warn.

Finally, quoting *Scott v. Alpha Beta Co.* (1980) 104 Cal.App.3d 305, a case involving a slip and fall inside a grocery store, Palaioroutas argues, "[O]n a day when the defendant knows that water will be tracked into the store by customers and deposited on the floor rendering it slippery, the purpose of the notice requirement is fulfilled and such evidence is enough to allow the question of negligence to go to the jury." (*Id.* at p. 309,

20

citing *Jasko v. F. W. Woolworth Co.* (1972) 177 Colo. 418 [494 P.2d 839, 840].) *Scott* considered the duty of a *private* entity to maintain the *inside* of a store; it has nothing to do with liability for falls occurring outdoors on public property where individuals are necessarily exposed to the elements. It is not necessarily apparent to grocery store patrons that the floor inside of the store may be wet. It is more than reasonably apparent to an ordinary person using due care that a metal drain outside in the rain will be wet and more slippery than it would be if it was dry.

## DISPOSITION

The judgment is affirmed. The Regents are awarded their costs on appeal.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:



BENDIX, Acting P. J.



M. KIM, J.


21